No. 77–1581. BROWN TRANSPORT CORP. *v.* ATCON, INC. Ct. App. Ga. Certiorari denied. 

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACKMUN joins, dissenting.

Respectfully, I dissent from the denial of certiorari.

I

Section 223 of the Motor Carrier Act, 49 Stat. 565, 49 U. S. C. § 323, prohibits a common carrier by motor vehicle from delivering freight transported in interstate commerce until all tariff rates and charges have been paid, except as permitted by rules and regulations of the Interstate Commerce Commission. The Interstate Commerce Commission, pursuant to 49 U. S. C. § 323, has adopted regulations that allow delivery without prior collection of freight charges but limit the credit that may be extended: Freight bills must be presented to the shipper and collected within seven days. 49 CFR § 1322 (1977). A "shipper" is defined as the person who undertakes to pay the tariff charges. *Ibid.* The regulations are silent about what happens if the carrier fails to comply with the time limits established by them. The question raised by this case is whether failure by the carrier to comply with

the time limits prescribed by 49 CFR § 1322 (1977) estops the carrier from collecting the freight charges from the shipper.

The Georgia Court of Appeals in this case held that it did, thereby joining the Seventh Circuit, which had reached a similar result in *Consolidated Freightways Corp. of Delaware* v. *Admiral Corp.*, 442 F. 2d 56 (1971).

Judge Swygert dissented in the *Consolidated Freightways Corp.* case, reasoning that "[n]othing in the Motor Carrier Act provides that a carrier's failure to comply with section 323 or the Interstate Commerce Commission's credit regulation should result in the carrier's forfeiting its right to collect freight charges." *Id.*, at 65. At least two jurisdictions share this view. *AAA Trucking Corp.* v. *Spherex, Inc.*, 110 N. H. 472, 272 A. 2d 594 (1970); *East Texas Motor Freight Lines* v. *Franklin County Distilling Co.*, 184 S. W. 2d 505 (Tex. Civ. App. 1944).

This conflict among jurisdictions over an issue which "imperatively demand[s] a single uniform rule," *Cooley* v. *Board of Wardens*, 12 How. 299, 319 (1852), commands the Court's immediate attention. There is further justification for review in *Pittsburgh, C., C. & St. L. R. Co.* v. *Fink*, 250 U. S. 577 (1919). There the Court held that a shipper remains liable for the full legal tariff even though the carrier mistakenly billed him for less, rejecting an argument that estoppel prevented collection on the ground that "[e]stoppel could not become the means of successfully avoiding the requirement of the act as to equal rates, in violation of the provisions of the statute." *Id.*, at 583. The *Fink* case, although concerning Interstate Commerce Act provisions regulating railroads and not motor carriers, is directly analogous to this case, suggesting that the decision below may be at variance with our prior case law.

Because of the substantiality of the federal issue raised, I would grant certiorari and set this case for argument.

## II

Although I dissent from denial of certiorari, it must be acknowledged that this case is no more deserving of plenary consideration than many other cases in which certiorari has been denied so far this Term.

### A

During the week of September 25, the Court met in Conference to deal with the petitions for certiorari, jurisdictional statements in appeals, petitions for rehearing, and miscellaneous motions that had accumulated and had been studied during the summer.* There was a total of 992 items on the Conference List, of which 865 were petitions for writs of certiorari and 59 were appeals. As the Order Lists for this Term prior to today indicate, of these the Court has so far granted 24 petitions for certiorari, 23 paid and 1 unpaid, and has set for plenary consideration 6 appeals. In addition, summary action on the merits was taken on 15 petitions for certiorari, 8 paid and 7 unpaid, and on 30 statements of jurisdiction. Seven hundred and ninety-four petitions for certiorari were denied, 365 paid and 429 unpaid. Twenty-one appeals were dismissed and denied. There were thus 396 paid petitions for certiorari acted on and 437 unpaid, for a total of 833. Fifty-seven of the 59 appeals were also disposed of. For one reason or other, the remaining 32 petitions and 2 appeals have been held over for later action.

The 23 paid petitions granted amount to 5.81% of the 396 paid petitions acted upon. Summary action was taken on an additional 2.02%, making a total of 7.83% of the paid peti-

---

*The analysis following in the text pertains only to this Term's first Conference List. I have little doubt, however, that study of our dispositions of cases on subsequent Conference Lists would yield similar results. New filings accumulate at the rate of about 80 per week. As of the close of business on November 29, 869 paid petitions and statements of jurisdiction had been filed so far this Term, together with 808 unpaid petitions and statements of jurisdiction.

tions that were either granted or disposed of on the merits. The single unpaid petition granted amounted to 0.23% of the unpaid petitions acted on. Summary action was taken on an additional 1.60% of unpaid petitions, making a total of 1.83% of the unpaid petitions which were granted or on which summary action was taken.

B

Our Rule 19 provides that one of the principal factors in determining whether certiorari should be granted is whether the decision below conflicts with another decision: Is the federal law, statutory or constitutional, being interpreted and enforced differently in different sections of the country? This has been an important criterion for the exercise of the Court's powers since most of the Court's jurisdiction was made discretionary in 1925.

When one examines the petitions for certiorari on the September 25 Conference List that have so far been denied, it is not difficult to find a good many cases in which the Court refused to review lower court decisions that conflicted with decisions of other federal or state appellate courts. The following are examples of such cases.

*Mansfield* v. *Estelle,* No. 77–6709, order reported below (opinion unpublished), 568 F. 2d 1366 (CA5 1978): "farce or mockery" standard for judging the effectiveness of retained counsel; a more stringent standard for appointed counsel. Cf. *United States* v. *DeCoster,* 159 U. S. App. D. C. 326, 487 F. 2d 1197 (1973) (diligent, conscientious, and reasonably competent assistance); *Moore* v. *United States,* 432 F. 2d 730, 736 (CA3 1970) ("the exercise of the customary skill and knowledge which normally prevails at the time and place"); *United States ex rel. Williams* v. *Twomey,* 510 F. 2d 634, 641 (CA7 1975) ("assistance which meets a minimum standard of professional representation"); *United States* v. *Easter,* 539 F. 2d 663, 666 (CA8 1976) ("reasonably competent" assistance). Also cf. *United States* v. *McCord,* 166 U. S. App.

D. C. 1, 509 F. 2d 334 (1974), cert. denied, 421 U. S. 930 (1975); *Goodwin* v. *Cardwell,* 432 F. 2d 521 (CA6 1970); *United States ex rel. Williams* v. *Twomey, supra,* at 640; *Blanchard* v. *Brewer,* 429 F. 2d 89 (CA8 1970), cert. denied, 401 U. S. 1002 (1971); *Ellis* v. *Oklahoma,* 430 F. 2d 1352 (CA10 1970), cert. denied, 401 U. S. 1010 (1971), all rejecting the distinction between paid and appointed counsel.

*United States* v. *Kelley,* No. 77–1729, opinion below, 568 F. 2d 259 (CA2 1978): timely administrative claim is not a jurisdictional prerequisite to recovery in suits in which the United States is substituted as defendant pursuant to the Federal Drivers' Act, 28 U. S. C. §§ 2679 (b)–(e). Contra, *Meeker* v. *United States,* 435 F. 2d 1219 (CA8 1970).

*Pennsylvania* v. *United States Tobacco Co.,* No. 77–1780, opinion below, 478 Pa. 125, 386 A. 2d 471 (1978): broad interpretation of "solicitation" in 15 U. S. C. § 381 (a), which prohibits a State from taxing the income of persons whose only contact with the State is solicitation of orders. Contra, *Clairol, Inc.* v. *Kingsley,* 109 N. J. Super. 22, 262 A. 2d 213. aff'd, 57 N. J. 199, 270 A. 2d 702 (1970), dismissed for want of a substantial federal question, 402 U. S. 902 (1971).

*Lacey* v. *United States,* No. 77–1751, order reported below (opinion unpublished), 578 F. 2d 1371 (CA2 1978): not impermissibly coercive *per se* to give a second *Allen (Allen* v. *United States,* 164 U. S. 492 (1896)) charge to a jury that has twice reported inability to reach a verdict and has not requested repetition of the charge. Accord, *United States* v. *Robinson,* 560 F. 2d 507 (CA2 1977) (en banc). Contra, *United States* v. *Seawell,* 550 F. 2d 1159 (CA9 1977).

*Guiffre* v. *United States,* No. 77–1778, opinion below 576 F. 2d 126 (CA7 1978): coverage of federal bank robbery statute, 18 U. S. C. § 2113 (b), is not limited to conduct that would fall within the common-law definition of larceny. Accord, *United States* v. *Fistell,* 460 F. 2d 157 (CA2 1972); *Thaggard* v. *United States,* 354 F. 2d 735 (CA5 1965), cert. denied, 383

U. S. 958 (1966). Contra, *LeMasters* v. *United States,* 378 F. 2d 262 (CA9 1967); *United States* v. *Rogers,* 289 F. 2d 433 (CA4 1961) (dictum).

*Holcomb* v. *United States,* No. 77–6857, order reported below, 578 F. 2d 1381 (CA6 1978): a person accused of violating 18 U. S. C. § 922 (a)(6) by falsely denying that he has ever been convicted of a crime is not entitled to litigate the constitutionality of that conviction. Accord, *United States* v. *Edwards,* 568 F. 2d 68 (CA8 1977); *United States* v. *Allen,* 556 F. 2d 720 (CA4 1977); *United States* v. *Graves,* 554 F. 2d 65 (CA3 1977) (en banc); *United States* v. *Ransom,* 545 F. 2d 481 (CA5), cert. denied, 434 U. S. 908 (1977). Contra, *United States* v. *Pricepaul,* 540 F. 2d 417 (CA9 1976).

*Burke* v. *New Jersey Education Assn.,* No. 78–177, opinion below, 579 F. 2d 764 (CA3 1978): litigation of federal constitutional issues in a 42 U. S. C. § 1983 action is not precluded by a prior state adjudication of the same cause of action in which the federal issues could have been but were not raised. Other Circuits have taken different approaches to this issue. Cf. *Kurek* v. *Pleasure Driveway and Park District of Peoria,* 557 F. 2d 580 (CA7 1977); *Graves* v. *Olgiati,* 550 F. 2d 1327 (CA2 1977); *Scoggin* v. *Schrunk,* 522 F. 436 (CA9 1975); *Spence* v. *Latting,* 512 F. 2d 93 (CA10), cert. denied, 423 U. S. 896 (1975); *Lovely* v. *Laliberte,* 498 F. 2d 1261 (CA1 1974).

*Johnson* v. *Georgia,* No. 77–6607, opinion below, 240 Ga. 526, 242 S. E. 2d 53 (1978): Double Jeopardy Clause does not bar a State from revoking an individual's probation for an offense of which he was previously acquitted. Contra, *People* v. *Grayson,* 58 Ill. 2d 260, 319 N. E. 2d 43 (1974).

*McKethan* v. *United States,* No. 77–1545, and *Garner* v. *United States,* No. 77–1557, opinion below, 574 F. 2d 1141 (CA4 1978): admission into evidence of grand jury testimony of unavailable witness proper under Confrontation Clause and Federal Rules of Evidence. But see *United States* v. *Gonzalez,* 559 F. 2d 1271 (CA5 1977); *United States* v. *Fiore,* 443 F. 2d 112 (CA2 1971).

1020

**C**

Also among the petitions for certiorari that were denied were those appearing to conflict with a decision of this Court. Under our Rules, this is a substantial reason for granting certiorari. Examples of such cases follow.

*Sears, Roebuck & Co.* v. *Roberts,* No. 78–26, opinion below, 573 F. 2d 976 (CA7 1978): assignor of exclusive license may recover in action for fraud against assignee despite invalidity of the patent. Arguably inconsistent with *Lear, Inc.* v. *Adkins,* 395 U. S. 653 (1969).

*First Nat. Bank of Memphis* v. *Smith,* No. 78–92, opinion below *sub nom. Torian Estate* v. *Smith,* 564 S. W. 2d 521 (Ark. 1978): State need not give full faith and credit to judgment of court of sister State with *in personam* jurisdiction over property claimants but affecting personal property with no connection to that State. Arguably inconsistent with *Baker* v. *Baker, Eccles & Co.,* 242 U. S. 394 (1917).

*Arnold* v. *Hogan,* No. 77–6621, order below unpublished, D. C. Ct. App., No. 12347 (1978): neither the Due Process Clause nor the Ex Post Facto Clause infringed by the abolition of the corroboration requirement in a criminal trial for rape, where the requirement was judge made but longstanding, and is abolished in the course of the instant trial. Arguably inconsistent with *Weiler* v. *United States,* 323 U. S. 606 (1945), and *Calder* v. *Bull,* 3 Dall. 386, 390 (1798).

*Mellon Bank* v. *Southland Mobile Homes of S. C., Inc.,* No. 78–188, opinion below *sub nom. Southland Mobile Homes* v. *Associates Financial Services Co.,* 270 S. C. 527, 244 S. E. 2d 212 (1978): venue in suits against national banks under the National Bank Act, 12 U. S. C. § 94. Arguably inconsistent with *Michigan Nat. Bank* v. *Robertson,* 372 U. S. 591 (1963).

*Smith* v. *Collin,* No. 77–1736, opinion below, 578 F. 2d 1197 (CA7 1978): local ordinance prohibiting the dissemination of materials that would promote hatred toward persons on the

basis of their heritage held unconstitutional. Arguably inconsistent with *Beauharnais* v. *Illinois,* 343 U. S. 250 (1952).

## D

Rule 19 also indicates that likely candidates for certiorari are those cases in which a state or federal court has decided an important question of federal law not heretofore determined by this Court. Some of the cases from our initial Conference List which involved issues of this kind and which the Court declined to review are the following.

*Lowe* v. *United States,* No. 78–5044, and *Dixon* v. *United States,* No. 78–5052, opinion below, 575 F. 2d 1193 (CA6 1978): whether 19 U. S. C. § 482 subjects mail entering the United States to customs inspection at a place other than the point of entry into this country, an issue reserved in *United States* v. *Ramsey,* 431 U. S. 606 (1977).

*Beatty* v. *Lycoming County Children's Services,* No. 77–1703, opinion below *sub nom. In re William L.,* 477 Pa. 322, 383 A. 2d 1228 (1978): rejecting equal protection and due process challenges to a Pennsylvania statute permitting termination of parental rights (so that the child may be adopted) on a showing of incapacity, without any evidence of abuse or misconduct.

*Warden of West Virginia Penitentiary* v. *Jones,* No. 77–1734, opinion below, — W. Va. —, 241 S. E. 2d 914 (1978): *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975) is to be applied retroactively to collateral proceedings, an issue not expressly decided in *Hankerson* v. *North Carolina,* 432 U. S. 233 (1977).

*Eastern Scientific Co.* v. *Wild Heerbrugg Instruments, Inc.,* No. 77–1769, opinion below, 572 F. 2d 883 (CA1 1978): under *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36 (1977), territorial restrictions enforced by resale price maintenance are not *per se* illegal.

*Indiana* v. *Martin,* No. 77–1822, order reported below, 577 F. 2d 749 (CA7 1978): the prosecution bears the burden of

showing reliability of in-court identification subsequent to impermissibly suggestive lineup identification.

*Frazier* v. *Weatherholtz,* No. 77–6460, opinion below, 572 F. 2d 994 (CA4 1978): burden of proving self-defense may be placed on the accused in a criminal prosecution.

*International Business Machines Corp.* v. *FCC,* No. 77–1540, opinion below *sub nom. American Tel. & Tel. Co.* v. *FCC,* 572 F. 2d 17 (CA2 1978): whether the Commission possesses and has consciously exercised discretion to consider whether to refrain from rate regulation of resellers of telephone transmission services.

*Marshall* v. *Daniel Construction Co.,* No. 77–1697, opinion below, 563 F. 2d 707 (CA5 1977): worker has no right under Occupational Safety and Health Act to refuse to perform tasks that he reasonably believes present an immediate risk of death or serious injury, and employee who does so may be properly discharged; the Secretary of Labor's regulation to the contrary held invalid.

*Kerr-McGee Chemical Corp.* v. *Andrus,* No. 77–1785, order reported below, 187 U. S. App. D. C. 426, 574 F. 2d 637 (1978): regulations promulgated by the Secretary of the Interior may be applied retroactively to deny mining leases that were assertedly granted under formerly prevailing standards.

*University of Texas Medical Branch at Galveston* v. *United States,* No. 77–1520, opinion below, 557 F. 2d 438 (CA5 1977): the impact of *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191 (1967), implying a right of action under § 15 of the Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1152, 33 U. S. C. § 409, upon the availability of a defense under the Limitation of Shipowners' Liability Act.

*Early* v. *Palm Beach Newspapers, Inc.,* No. 77–1649, opinion below, 334 So. 2d 60 (Fla. App. 1976), appeal and cert. dismissed, 354 So. 2d 351 (Fla. 1977): statements labeled as opinions or editorials and containing no misstatements of fact may not be the subject of a constitutionally valid libel action.

## E

I do not suggest that the Court should have granted certiorari in *all* of these cases or that it should review *all* cases of this kind in the future. The reason is that we are performing at our full capacity, *i. e.,* we are now extending plenary review to as many cases as we can adequately consider, decide and explain by full opinion.

In 1937, in a letter to Senator Wheeler, Mr. Chief Justice Hughes stated that the Court was fully abreast of its work and was granting plenary consideration to all cases that deserved decision by an institution such as the Supreme Court. The Chief Justice said:

> "Granting certiorari is not a matter of favor but of sound judicial discretion. It is not the importance of the parties or the amount of money involved that is in any sense controlling. The action of the Court is governed by its rules.

> . . . . .

> "I think that it is safe to say that about 60 percent of the applications for certiorari are wholly without merit and ought never to have been made. There are probably about 20 percent or so in addition which have a fair degree of plausibility but which fail to survive critical examination. The remainder, falling short, I believe, of 20 percent, show substantial grounds and are granted. I think that it is the view of the members of the Court that if any error is made in dealing with these applications it is on the side of liberality."

In 1937, there were fewer than 1,000 new filings on the Supreme Court docket. In 1962, there were about 2,800 and today about 4,000. No longer is it possible to review 20% or even 10% of the cases in which petitions are filed.

For the 24 years ending with the 1970 Term, in cases granted plenary consideration, the Court issued an average

of 101 full opinions plus 10 to 15 *per curiam* opinions. Since 1970, we have averaged 132 full opinions plus 15 *per curiams*— these opinions deciding an average of 170 cases—and we cannot hope substantially to exceed this average or to increase the percentage of all cases docketed to which we give plenary review. Indeed, if the certiorari docket resumes the remarkable growth that it exhibited prior to 1972, which it may well do when the output of the courts of appeals begins to reflect the many new judgeships created by the Omnibus Judgeship Act just passed by Congress, the percentage of petitions filed that can be reviewed here will inevitably decline ever further.

There is no doubt that those concerned with the coherence of the federal law must carefully consider the various alternatives available to assure that the appellate system has the capacity to function in the manner contemplated by the Constitution. As others have already noted, there is grave doubt that this function is being adequately performed.

In 1972, a study group chaired by Paul Freund of the Harvard Law School examined the problem. Its stark conclusion was:

> "The statistics of the Court's current workload, both in absolute terms and in the mounting trend, are impressive evidence that the conditions essential for the performance of the Court's mission do not exist. For an ordinary appellate court the burgeoning volume of cases would be a staggering burden; for the Supreme Court the pressures of the docket are incompatible with the appropriate fulfillment of its historic and essential functions." Federal Judicial Center, Report of the Study Group on the Caseload of the Supreme Court 5 (1972), reprinted in 57 F. R. D. 573, 581 (1973).

Likewise, the Commission on Revision of the Federal Court Appellate System, which was established by Congress, concluded in 1975 that the present appellate arrangements leave

unsettled too many conflicting decisions and important questions of federal law. The point has been reached at which "the percentage of cases accorded review [has] dipped below the minimum necessary for effective monitoring of the nation's courts on issues of federal statutory and constitutional law." Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change 29 (1975), reprinted in 67 F. R. D. 195, 217 (1976).

The Commission recommended the creation of a National Court of Appeals, which would not be interposed between the lower courts and this Court but whose mission in the main would be to decide cases that this Court referred to it. Legislation was proposed to implement the Commission's recommendations. Under the proposal, cases from lower courts would first be filed here, as under the present system. This Court would then not only select and dispose of its own argument docket, but would also refer additional cases to the new court for its decision. The bill did not proceed beyond the hearing stage.

MR. CHIEF JUSTICE BURGER.

Reasonable men can, and do, have differing views on the specific cases recited by MR. JUSTICE WHITE, but his analysis of the broad workload problem confronting this Court is sound and constitutes an important service. It is not a healthy situation when cases deserving authoritative resolution must remain unresolved because we are currently accepting more cases for plenary review than we can cope with in the manner they deserve.

It is now six years since a committee of distinguished practitioners and scholars, all of them intimately familiar with the work of the Court, concluded that the growth in the volume and changing complexion of that work called for a remedy. Federal Judicial Center, Report of the Study Group on the Caseload of the Supreme Court (1972), 57 F. R. D. 573

(1973).[1] That committee, chaired by Professor Paul A. Freund,[2] after tracing the rise in the Court's filings and opinions, proposed the creation of a new national, intermediate appellate court to afford review of cases which it was not possible for this Court to review. The Study Group on the Caseload of the Supreme Court saw a twofold function for the proposed court:

> "(1) screening all petitions for certiorari and appeals that would at present be filed in the Supreme Court, referring the most review-worthy . . . to the Supreme Court . . . , and denying the rest; and
>
> "(2) retaining for decision on the merits cases of genuine conflict between circuits (except those of special moment, which would be certified to the Supreme Court)." *Id.,* at 611.

Responding to urgings from the Judicial Branch and the tremendous increase in the workload of the federal courts, the Congress in 1972 established a commission representing all three branches of Government to study the problems and make recommendations.[3] The commission requested the

---

[1] In the first Term of Chief Justice Warren's tenure (O. T., 1953), for example, this Court announced 65 signed opinions; his final (1968) Term, 99; with an average of 96, 1953 to 1968 inclusive. The average, 1969 through 1977, was 125.

[2] Other members of the committee were: Alexander M. Bickel, Peter D. Ehrenhaft, Russell D. Niles, Bernard G. Segal, Robert L. Stern, and Charles A. Wright.

[3] The Chairman and Vice Chairman of the commission were Senator Roman L. Hruska and Judge J. Edward Lumbard, respectively; Professor A. Leo Levin was Executive Director. Members appointed from the Senate and House, and by the President and Chief Justice, were Senators Quentin N. Burdick, Hiram L. Fong, and John L. McClellan; Congressmen Jack Brooks, Walter Flowers, Edward Hutchinson, and Charles E. Wiggins; Emanuel Celler, Dean Roger C. Cramton, Francis R. Kirkham, Judge Alfred T. Sulmonetti, Judge Roger Robb, Bernard G. Segal, and Professor Herbert Wechsler.

views of each Member of this Court. My response in part stated:

"[I]f no significant changes are made in federal jurisdiction, including that of the Supreme Court, the creation of an intermediate appellate court in some form will be imperative. The notion that nine Justices of the Supreme Court can deal as effectively and correctly with four times as many docketed cases as were dealt with only four decades ago may seem flattering to the incumbent Justices, but Congress must become aware of the enormous change in the burdens on the Justices in that short period of time. Indeed, it can be documented that as far back as 40 years ago, 10 years after the Judiciary Act of 1925, many of the Justices were even then apprehensive about the capacity of the Supreme Court to perform the functions performed in its first 150 years. The changes brought on in the 20th century and the new social, political and economic developments have surely not diminished the importance of the questions presented to the Supreme Court and have vastly increased the volume of important questions which can have an impact of great significance on the country." Report of the Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change, reprinted in 67 F. R. D. 195, 398–399 (1976).

In June 1975, the Commission on Revision of the Federal Court Appellate System issued its report, recommending

"the creation of a new national court of appeals, designed to increase the capacity of the federal judicial system for definitive adjudication of issues of national law, subject always to Supreme Court review." *Id.*, at 208.

That Commission found four significant consequences resulting from the inability of the federal judicial system to provide

adequate capacity for the declaration of national law: (a) unresolved intercircuit conflict; (b) delay; (c) a burden on the Supreme Court to hear cases arising from intercircuit conflict otherwise less worthy than many cases denied review; and (d) resulting uncertainty in the law. *Id.*, at 217–219.

The Commission proposed a National Court of Appeals consisting of seven judges with reference jurisdiction and transfer jurisdiction. Under the proposed reference jurisdiction, the Supreme Court would be empowered to refer any case within its appellate jurisdiction to the National Court of Appeals either for a decision on the merits or, alternatively, for a decision as to whether the National Court of Appeals should review the case. Under the proposed transfer jurisdiction, any court of appeals could, in appropriate and specified circumstances, transfer any case to the National Court of Appeals for a nationally binding decision, subject to this Court's consideration. *Id.*, at 238–247.

The recommendations of the Study Group on the Caseload of the Supreme Court, commonly called the "Freund Committee," have been available to the Congress and the Bar since 1972. The recommendations of the Commission on the Federal Court Appellate System have been available since 1975.

The dilemma now confronting this Court—and the country— is not new. Under the Judiciary Act of 1789, Congress created only 13 federal district judgeships and six Justices of the Supreme Court. It did not provide for an intermediate appellate court staffed, as today, with United States circuit judges. Supreme Court Justices were required to "ride circuit" and to sit with district judges to form circuit courts, sometimes reviewing district court appeals, sometimes sitting as trial judges. Later these circuit-riding judges, acting as Supreme Court Justices, sat in review of the very cases in which they had participated on Circuit.

Chief Justice John Jay and the Associate Justices urged relief and circuit courts of appeal were authorized in the

Judiciary Act of 1801; however, after the election of Thomas Jefferson, that statute was repealed the following year. Subsequently, Chief Justice Marshall unavailingly urged the creation of an intermediate tier of courts of appeals. Thus, nearly a century passed before such courts were finally created in 1891; they exist today as the United States Courts of Appeals for the 11 Circuits.[4]

In my response of May 29, 1975, to the Commission, 67 F. R. D., at 396, I strongly urged that if an intermediate court was created it should not be a permanent tier of new judges at the outset. Rather, I suggested that Congress seriously consider the creation of a temporary court so that for five years, more or less, an experimental program could be carried out.[5] The experience could then serve as a valuable guide to the Congress, without the burden of the irreversible step of establishing a permanent intermediate court.[6] MR. JUSTICE WHITE, too, favored an additional appellate court, "at least on a trial basis." He said in his letter to the Commission:

> "I should also emphasize that the proposed new court would not only permit the decision of a good many cases that are not now being decided at all by this Court, but

[4] Under the recent Omnibus Judgeship Act of 1978, Pub. L. 95–486, 92 Stat. 1629 (Oct. 20, 1978), the total number of circuit judgeships was increased from 97 to 132.

[5] The mode of selection of members of such an ad hoc court can be worked out either along the lines recommended by the Freund Committee or through some other neutral mechanism.

[6] There is, of course, precedent for this suggestion, for Congress has created temporary courts in the past. *E. g.*, Special Regional Rail Reorganization Court, created by the Regional Rail Reorganization Act of 1973, § 209 (b), 87 Stat. 999; Temporary Emergency Court of Appeals, created by the Act of Dec. 22, 1971, § 211 (b), 85 Stat. 749; Emergency Court of Appeals, created by the Emergency Price Control Act of 1942, § 204, 56 Stat. 31.

would also (1) permit plenary consideration in selected cases which are within our compulsory appellate jurisdiction but which are presently being summarily disposed of here; (2) permit this Court to decline full consideration of and refer to the new court a substantial number of cases the issues in which are not unusually important or complex but which are now reviewed here because of existing conflicts among the circuits or among the federal and state courts; (3) enable this Court, if it was so minded, to reduce the total number of cases in which it now hears oral arguments and writes full opinions, perhaps to the yearly average of approximately 100 that obtained for 15 years prior to the 1970 Term; and (4) present the opportunity for this Court to review some cases that it would not now otherwise hear because of docket pressures." Report of the Commission on Revision of the Federal Court Appellate System, 67 F. R. D., at 402.[7]

After nearly nine years' delay, the 95th Congress recently created 117 additional district and 35 additional circuit judgeships—all of them long desperately needed to meet rising caseloads at both levels. This rise in caseload[8] is thought by many observers to result from multiple sources: (a) the enactment of more than 50 statutes by Congress since 1969

---

[7] Letters to the Commission from JUSTICES BLACKMUN, POWELL, and REHNQUIST reflect general agreement with these views of MR. JUSTICE WHITE on the need for some relief if this Court is to achieve and maintain the optimum level of quality in its work. 67 F. R. D., at 404, 406, 407, respectively. MR. JUSTICE STEWART expressed the view that it is "likely that the day would come when a new court would be needed." Id., at 400.

[8] For the year ending June 30, 1970, district court filings were 125,423, and for the year ending June 30, 1978, they were 166,539. Courts of appeals filings rose from 11,662 during the same period in 1970 to 18,918 for the year ending June 30, 1978.

increasing the jurisdiction of federal courts; (b) the increasing tendency to bypass available state and municipal remedies in favor of assumed swifter remedies in federal courts; (c) the increasing perceived need for courts to become "problem solvers" on great social and economic problems rather than the traditional resolvers of discrete, manageable disputes; [9] (d) the default, perceived or real, of executive and legislative solutions; and (e) the increasing complexity of much of the litigation arising from a modern society.[10]

We cannot assume any lessening in the expansion of federal jurisdiction or in congressional response to new demands.[11] When the 152 newly created federal judgeships are filled and operational, decisions of those judges will likely generate a significant increase in cases subject to review on appeal or on certiorari in this Court.

The additional judgeships may solve short-term problems, but the long-term problems of the Supreme Court analyzed by the Freund Committee and the Commission on Revision of the Federal Court Appellate System remain as they were a decade ago. If the improvement in the expeditious dispensation of justice intended by the Congress and the President

---

[9] See S. Rifkind, Are We Asking too Much of our Courts?, address delivered at the National Conference on the Causes of Popular Dissatisfaction with the Administration of Justice, 70 F. R. D. 96, 101–104 (1976).

[10] Provocative and thoughtful analyses of these subjects are not wanting. See, e. g., Hellman, The Business of the Supreme Court Under the Judiciary Act of 1925: The Plenary Docket in the 1970's, 91 Harv. L. Rev. 1711 (1978); S. Rifkind, supra, n. 9; Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281 (1976).

[11] These, obviously, are policy matters for the political branches; but it is equally true that the Judiciary has an obligation to help focus attention on its needs as they are perceived by judges who must give effect to legislation relating to the administration of justice. It is for Congress to develop appropriate measures to accommodate the tension arising from contending demands on judicial resources.

when they authorized 152 new federal judges is to be realized, these problems should be faced without waiting for a crisis.

MR. JUSTICE BRENNAN.

It seems appropriate, in light of footnote 7 of the memorandum of THE CHIEF JUSTICE, to note my statement to the Commission, 67 F. R. D., at 400, that MR. JUSTICE BRENNAN "remains completely unpersuaded, as he has repeatedly said, that there is any need for a new national court." See also my article, The National Court of Appeals: Another Dissent. 40 U. Chi. L. Rev. 473 (1973).