STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERT SIMON, ROBERT VAN WETTERING, JR. AND FRANK P. HAUSSMANN, JR., DEFENDANTS-APPELLANTS.

Argued September 26, 1978—Decided February 26, 1979.

*Mr. Lewis Stein* argued the cause for appellant Robert Van Wettering, Jr. (*Messrs. Nusbaum, Stein* and *Goldstein,* attorneys).

*Mr. Thomas M. Maher* argued the cause for appellant Frank P. Haussmann, Jr.

*Mr. Solomon Rosengarten,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

HANDLER, J. This is an appeal from criminal convictions of conspiracy and other crimes based upon the misconduct of public officials while in office. At the trial the judge submitted to the jury special interrogatories relating to the applicability of the statute of limitations as a bar to the criminal prosecution. The jury was directed to respond to these interrogatories before it was asked to deliberate upon its general verdict and without being fully instructed with respect to the law applicable to the criminal charges. We must determine whether this procedure constituted reversible error.

On September 19, 1974, appellants Van Wettering and Haussmann, together with Simon, were indicted for conspiracy to receive money unlawfully for performing official duties and to commit misconduct in office in violation of *N. J. S. A.* 2A:98-1, as well as for the substantive crimes which were the objects of the conspiracy, *N. J. S. A.* 2A:105-1 and *N. J. S. A.* 2A:85-1. The jury found each defendant guilty on all counts. The Appellate Division, in an unpublished opinion, affirmed their convictions.

Defendants Van Wettering and Haussmann were charged as former public officials of the Borough of Little Ferry, New Jersey, having served as members of the municipal governing body and the planning board for varying periods from 1963 to 1969. They and other unindicted co-conspirators

were accused of participating in a scheme to coerce property owners and contractors into making illegal payments to members of the governing body and planning board in order to gain approval of construction projects and zoning changes. This conspiratorial scheme was pursued throughout the years they were in office.

The testimony of the State's witnesses indicated that these payments were made to Ferdinand Heinige, the mayor of Little Ferry, and Edward Gorleski, the borough's building inspector. Where a payment had been so arranged, Heinige would inform the planning board that a "deal" had been consummated and the proposed project would be approved. The monies collected by Heinige were accumulated in a safe at his home and distributed later to the planning board members as well as to certain members of the governing body.

The statute of limitations applicable to all counts upon which defendants were tried provides that an indictment must be returned within five years of the commission of an offense. *N. J. S. A.* 2A:159–2. The indictment was lodged against defendants on September 19, 1974. It therefore was necessary for the State to prove that the substantive crimes, the illegal receipt of monies and misconduct in office, had been committed within five years of the indictment, in other words, after September 19, 1969. Further, in order to prevail on the conspiracy charge, the State had to show that an overt act in furtherance of the conspiracy was committed within the same period of limitations. Only one of the 61 overt acts listed in the indictment was alleged to have occurred within this period, this, a payment by Heinige to defendants and others "on or about December 19, 1969".

A sharp fact issue arose as to whether payments were made to defendants in December 1969 and, if so, whether they were criminal in nature and in furtherance of the conspiracy charged in the indictment. It was conceded that the money used for these payments came from one of three sources, (1) payments made by one Vecchiotti to Heinige and Gorleski for approval of a proposed garden apartments development

known as Ledgewood Terrace, (2) the proceeds of a deal referred to as the Catherine Gardens or Swagger-Heinige transaction, or (3) "whatever else was left over" from past illegal payments to Heinige after distributions had been made to municipal officials in prior years.

Van Wettering and Haussmann contended that they had no knowledge of and played no part in the Swagger-Heinige transaction. That deal, they asserted, involved a completely separate conspiracy between defendant Simon and Heinige and three other individuals and therefore any payment by Heinige of monies derived from that transaction could not be deemed an overt act in furtherance of any conspiracy in which Van Wettering and Haussmann might have participated. This contention posed an intricate statute of limitations problem. Since the only overt act alleged to have occurred within the period of limitations was the payment of Heinige to various individuals in December 1969, if the source of such payment was the Swagger-Heinige transaction and that transaction was not part of the conspiracy with which defendants were charged, the conspiracy, and possibly the substantive charges against defendants, would be time-barred.

The trial judge sought to simplify the jury's consideration of these issues. The court informed all counsel at the close of the State's case of his proposal to employ a "bifurcate[d]" verdict procedure when the trial was at end. The judge explained that he would first submit to the jury special interrogatories dealing with the issues raised by the statute of limitations and then, if the jurors, through their answers to the interrogatories, determined that there occurred within the period of limitations an overt act in furtherance of a criminal conspiracy involving defendants, he would submit the case to the jury for deliberations upon a general verdict. Following this explanation, counsel for Simon characterized the proposed procedure "very fair", counsel for Van Wettering remarked that he did not "have any problem with that", and counsel for Haussmann said nothing.

After the defense had rested, the trial judge exhibited to counsel the special interrogatories which he proposed to submit to the jury. Those interrogatories read as follows:

### SPECIAL INTERROGATORIES

I. Do you find unanimously and beyond a reasonable doubt
 (a) that a distribution of money was made to any or all of the defendants, namely, ROBERT SIMON, ROBERT VAN WETTERING and FRANK P. HAUSSMANN, by FRED HEINIGE in or around December, 1969,

ROBERT SIMON YES .... NO ...
ROBERT VAN WETTERING YES .... NO ....
FRANK P. HAUSSMANN YES .... NO ....

 (b) that a distribution of money was made to any co-conspirators by FRED HEINIGE in or around December, 1969, apart from the Swagger-Heinige transaction.

YES ............ NO ....................

II. Do you find unanimously and beyond a reasonable doubt that the Heinige, Swagger, Stocek, Gorleski, Simon partnership was a separate and distinct transaction rather than part of the overall alleged conspiracies charging the defendants, namely, ROBERT SIMON, ROBERT VAN WETTERING and FRANK P. HAUSSMANN, with illegal receipt of money and misconduct in office, assuming for the purpose of this determination that such conspiracies were in fact committed.

YES .................... NO ....................

III. Do you find unanimously and beyond a reasonable doubt that a distribution of money was made to any or all of the defendants, namely, ROBERT SIMON, ROBERT VAN WETTERING and FRANK P. HAUSSMANN, or to any or all of the alleged co-conspirators, namely, EDWARD GORLESKI, RUSSELL STOCEK and JERRY VOZEH, by FRED HEINIGE in or around December, 1969, with regard to the Swagger-Heinige transaction.

YES .................... NO ................

Counsel for Simon and Van Wettering voiced no objection to the interrogatories. Counsel for Haussmann expressed reservations as to the wording of the second interrogatory, indicating that the phraseology of the question might be prejudicial to his client. He asserted that since the jury had to assume that a conspiracy existed in order to frame a response, the jury might be hopelessly confused by the need to assume in its subsequent general verdict deliberations that

no conspiracy existed. The judge nevertheless submitted the special interrogatories to the jury, with only brief instructions covering the crime of conspiracy, the statute of limitations, the presumption of innocence, the burden of proof and proof beyond a reasonable doubt. He gave no definition of an overt act nor any explanation of the general principles governing the function and deliberations of the jury in a criminal case. After four hours of deliberation, the jury returned, answering "yes" to each question. Counsel for Haussmann then moved for a mistrial because of the prejudicial impact of the second interrogatory, which motion was denied.

The judge proceeded to instruct the jury as to the remaining elements of the various offenses. After reviewing the charges in the indictment, he instructed the jurors to disregard all evidence relating to the Swagger-Heinige transaction, since they had already found that it was part of a separate conspiracy not involving the defendants. Further, he stated that the jury could no longer assume the existence of any conspiracy in which these defendants had participated. After five and one-half hours of deliberation, the jury returned verdicts of guilty on all counts.

Motions to set aside the verdicts and to grant defendants new trials because of various alleged trial errors were denied. The Appellate Division in affirming defendants' convictions was of the view that any errors committed by the trial judge were harmless beyond a reasonable doubt. We granted the petitions for certification filed by Van Wettering and Haussmann; Simon did not file a petition. 75 *N. J.* 588 (1977). Certification, however, was "limited to the issue of the [propriety of] the 'bifurcation' of the trial through the use of special interrogatories."

We conclude that the trial court committed serious error in propounding special interrogatories and in submitting them to the jury prior to its final deliberations upon a general verdict pursuant to full and adequate instructions. The error was not harmless and its commission requires a reversal of the convictions and remandment for a new trial.

## I

Analysis of the issues on appeal must proceed with initial stress on the basic importance of the right of trial by jury. "The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. The jury is an integral part of the court for the administration of justice, and on elementary principles its verdict must be * * * entirely free from the taint of extraneous considerations and influences." *Wright v. Bernstein,* 23 *N. J.* 284, 294–295 (1957); *Panko v. Flintkote,* 7 *N. J.* 55, 61 (1951). See *State v. Deatore,* 70 *N. J.* 100, 105–106 (1976); *State v. Jackson,* 43 *N. J.* 148, 157–158 (1964). It is a constitutional guarantee, *U. S. Const.* amend. VI; *N. J. Const.* (1947), Art. I, par. 9, to be scrupulously protected from encroachment or impairment with respect to a criminal defendant. See, *e. g., Peters v. Kiff,* 407 *U. S.* 493, 92 *S. Ct.* 2163, 33 *L. Ed.* 2d 83 (1972); *Duncan v. Louisiana,* 391 *U. S.* 145, 88 *S. Ct.* 1444, 20 *L. Ed.* 2d 491, reh. den. 392 *U. S.* 947, 88 *S. Ct.* 2270, 20 *L. Ed.* 2d 1412 (1968); *Turner v. Louisiana,* 379 *U. S.* 466, 85 *S. Ct.* 546, 13 *L. Ed.* 2d 424 (1965). In the trial of a criminal cause, the ultimate responsibility for determining guilt or innocence reposes solely in the jury and cannot be preempted or dislodged by the court. *United Brotherhood of Carpenters and Joiners v. United States,* 330 *U. S.* 395, 408–409, 67 *S. Ct.* 775, 781–782, 91 *L. Ed.* 973, 985 (1946). This was well expressed in *United States v. Spock,* 416 *F.* 2d 165, 180–181 (1 Cir. 1969), which pointed out that a jury in a criminal case has the paramount, exclusive and independent responsibility for making the final adjudication of guilt or innocence and cannot be compelled by the court to return a guilty verdict even though evidence of guilt is overwhelming.

The singular vice of special interrogatories, particularly in a criminal trial, is their potential for destroying the ability of the jury to deliberate upon the issue of guilt or innocence free of extraneous influences. This potential for

harm inheres in the subtly coercive effect interrogatories can have upon the course of a jury's deliberations. They can constitute a form of mental conditioning which is antithetical to the untrammeled functioning of the jury. The leading case explaining this is *United States v. Spock, supra,* where the court observed that direct control of a jury verdict and indirect judicial pressure upon a jury's deliberations can result from the use of special interrogatories:

> We are less concerned by the jury's possible fear of subsequent criticism with respect to special findings than we are with the subtle, and perhaps open, direct effect that answering special questions may have upon the jury's ultimate conclusion. There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step. A juror, wishing to acquit, may be formally catechized. By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.
>
> [416 *F.* 2d at 182; footnotes omitted].

See, *e. g., United States v. Bosch,* 505 *F.* 2d 78 (5 Cir. 1974); *United States v. Adcock,* 447 *F.* 2d 1337, 1339 (2 Cir.), *cert.* den. 404 *U. S.* 939, 92 *S. Ct.* 278, 30 *L. Ed.* 2d 252 (1971); *United States v. James,* 432 *F.* 2d 303, 307–308 (5 Cir. 1970), *cert.* den. 403 *U. S.* 906, 91 *S. Ct.* 2214, 29 *L. Ed.* 2d 682 (1971); *State v. Bock,* 80 *Idaho* 296, 310, 328 *P.* 2d 1065, 1074 (Sup. Ct. 1958); *State v. Osburn,* 211 *Kan.* 248, 505 *P.* 2d 742 (Sup. Ct. 1973); *State v. Heald,* 307 *A.* 2d 188, 192–193 (Me. Sup. Jud. Ct. 1973).

Special interrogatories have the unique capacity to proselytize the jury to the guilt of a defendant. This is illustrated by their use in this case. In answering these questions, the jury was required to make specific findings of fact and to *assume* repeatedly that defendants were conspirators and that conspiracies had been proven to exist. The first interrogatory asked for a finding "unanimously and beyond a reasonable doubt" whether there had been a distribution of

money in or around December 1969 apart from the Swagger-Heinige transaction by Heinige "to any co-conspirators". The last interrogatory directed the jury's attention to the Swagger-Heinige transaction, but again conditioned the jury to think in terms of "conspiracy" by referring to the participants as "co-conspirators". This warping effect also is seen in the second interrogatory which directed the jury to determine whether the partnership of Heinige, Swagger, Stocek, Gorleski and Simon "was a separate and distinct transaction rather than part of the overall alleged *conspiracies*", involving the "illegal receipt of money and misconduct in office" by defendants, "assuming for the purpose of this determination that *such conspiracies were in fact committed*." (Emphasis added). The subliminal suggestiveness of the special interrogatories upon the thought process of the jury in this case seems indisputable. The mental exercises called for by the interrogatories would appear to have brought the jury inexorably to the verge of the main question of the criminal trial, the existence of a criminal conspiracy involving defendants. See *United States v. Spock, supra.*

The serious risk of bending the jury to think in terms of defendants' ultimate guilt was exacerbated by the "bifurcated" presentation of the interrogatories. They were submitted to the jury before it was asked to deliberate upon and return a general verdict under complete instructions on all aspects of the case including its proper functioning as a jury. The jury was thereby forced into a premature consideration of criminal guilt for which it was inadequately prepared. Moreover, when the case was submitted to the jury in order to reach a general verdict, it was told simply to disregard its prior assumption as to the existence of a conspiracy involving defendants. In light of the conflicting evidence concerning the nature of the December 1969 payments and the fact that the jury labored for four hours over the special interrogatories, this admonition was a weak palliative. It was hardly to be expected to overcome the conscious or subconscious feelings as to guilt the jurors were impelled

to develop in making the factual determinations and reaching the conclusions called for by the special interrogatories.

The prejudicial potential of special interrogatories in a criminal proceeding might be thought to be mitigated if they are integrated with the jury's final deliberations following a full, adequate general charge on all facets of the case. Courts upholding the use of special interrogatories have usually done so in a format which attempted to relate the special interrogatories to the jury's overall deliberations and its general verdict. See *United States v. O'Looney,* 544 *F.* 2d 385 (9 Cir.), *cert.* den. 429 *U. S.* 1023, 97 *S. Ct.* 642, 50 *L. Ed.* 2d 625 (1976) (no plain error in distinguishing two objects of conspiracy on verdict form); *United States v. McCracken,* 488 *F.* 2d 406 (5 Cir. 1974) (approving verdict form with not guilty/not guilty by reason of insanity options, special verdicts generally disapproved); *United States v. Gallishaw,* 428 *F.* 2d 760 (2 Cir. 1970) (verdict form summarizing each count of indictment and listing "essential" elements not grounds for reversal, but essential element designation not recommended); *United States v. Haim,* 218 *F. Supp.* 922 (S. D. N. Y. 1963) (*dicta;* where conspiracy may be either misdemeanor or felony, defendant can request special verdict or other clarification); *United States v. Ogull,* 149 *F. Supp.* 272 (S. D. N. Y. 1957), aff'd *sub nom. United States v. Gernie,* 252 *F.* 2d 664 (2 Cir.), *cert.* den. 356 *U. S.* 968, 78 *S. Ct.* 1006, 2 *L. Ed.* 2d 1073, reh. den. 357 *U. S.* 944, 78 *S. Ct.* 1383, 2 *L. Ed.* 2d 1558 (1958) (defendant indicted for conspiracy to distribute drugs unlawfully; special interrogatory as to whether defendant's membership in conspiracy after crucial date, increasing criminal penalties, was to be answered, but only after a general verdict had been reached); *State v. Slaughter,* 70 *Wash.* 2d 935, 425 *P.* 2d 876 (Sup. Ct. 1967) (special interrogatory on armed feature required by statute but must not be answered until after guilty verdict rendered); *Commonwealth v. Beneficial Finance Co.,* 360 *Mass.* 188, 275 *N. E.* 2d 33 (Sup. Jud. Ct. 1971), *cert.* den. *sub nom. Farrell v. Mass.,* 407 *U. S.* 910, 92 *S. Ct.* 2433, 2435,

2448, 32 *L. Ed.* 2d 683 (1972) and *Beneficial Fin. Co. v. Mass.*, 407 *U. S.* 914, 92 *S. Ct.* 2433, 2434, 32 *L. Ed.* 2d 689 (1972) (defendants charged with bribery and conspiracy, four special interrogatories given to the jury but in addition, the jurors were instructed to return a general verdict; the court approved the use of special questions so long as they did not lead the jurors to a guilty verdict); *Commonwealth v. Golston, Mass.*, 366 *N. E.* 2d 744 (Sup. Jud. Ct. 1977), *cert.* den. 434 *U. S.* 1039, 98 *S. Ct.* 777, 54 *L. Ed.* 2d 788 (1978). (special questions with respect to brain death in murder prosecution related to jury's general verdict). Other cases have conceded the use of special interrogatories in limited situations where particular legal consequences require subsidiary or collateral findings of fact. *E. g., State v. Ellis*, 262 *N. C.* 446, 137 *S. E.* 2d 840 (Sup. Ct. 1964) (special questions "almost a necessity" in bastardy cases but discouraged in other prosecutions); *United States v. Mc-Cracken, supra; United States v. Haim, supra. Cf. Cook v. State*, 506 *S. W.* 2d 955 (Tenn. Ct. Crim. App. 1973), *cert.* den. 506 *S. W.* 2d 955 (1974) (*dictum;* special verdict discretionary with trial court).

These authorities underscore the deficits in this case. The trial court's resort to the special interrogatories as formulated had the prejudicial potential for leading the jury to adverse findings on the ultimate issue of guilt and this risk was greatly aggravated by the submission to the jury of the special interrogatories wholly apart from its final deliberations in conjunction with complete instructions governing all aspects of the case.

For these reasons we hold that the use of special interrogatories in the circumstances of this criminal trial was improper. In so ruling, it is to be recognized that the invalidity attendant upon the use of special interrogatories is not based upon constitutional grounds but upon our own standards applicable to the administration of criminal justice. *Cf. State v. Gregory*, 66 *N. J.* 510 (1975). Our current rules governing criminal trials do not presently authorize the use

of special interrogatories in a criminal case. By the same token, we have noted authority indicating that special interrogatories may be useful in certain situations. *Ante* at 202–203. Such interrogatories may serve to clarify complex issues in a lengthy trial and reduce juror confusion. See *United States v. Ogull, supra.* A particular law, moreover, may require the determination of specific facts which could be addressed through the prudent use of special interrogatories. See *e. g., United States v. McCracken, supra.* There may be techniques whereby the potential for prejudice of special interrogatories can be effectively nullified, as by their careful design and integration with the jury's general verdict under appropriate instructions. See, *e. g., United States v. O'Looney, supra; State v. Slaughter, supra.*

In view of the potential for mischief inherent in the use of special interrogatories, we should not endeavor through this case to anticipate and delineate the situations where such a procedure may be useful and valid. Such a determination should be rendered only after the entire subject has been given careful study. We have therefore requested the Criminal Practice Committee of the Supreme Court to consider the matter and evaluate whether and under what circumstances special interrogatories should be permissible in criminal trials. Until such time, however, as the Committee has completed its study and the Court has acted upon any recommendations through the promulgation of pertinent rules and appropriate guidelines, special interrogatories as a tool in criminal trials are not condoned, and their use discouraged.

## II

The Appellate Division, in a cursory opinion, concluded that the error involved in the use of special interrogatories was harmless beyond a reasonable doubt and did not, therefore, require a reversal of the convictions. We disagree.

■■ The State, as well as the dissent, *Post* at 210–211, in defending these convictions, appears to rely upon the

rationale of defendant-invited error. It seizes upon the circumstance that defendants, aside from Haussmann, did not object to or even remonstrate with the court concerning its decision to submit to the jury the special interrogatories prior to its final deliberations on the entire case. These ill-conceived procedures are viewed as defendant-shared error barring appellate relief. Trial errors originating with defendants ordinarily cannot serve as a vehicle for reversal on appeal. *State v. Pontery,* 19 *N. J.* 457, 469–471 (1955); *State v. Auld,* 2 *N. J.* 426 (1949); *State v. Riley,* 111 *N. J. Super.* 551, 553 (App. Div. 1970), certif. den. 57 *N. J.* 432 (1971); *State v. Sykes,* 93 *N. J. Super.* 90, 95 (App. Div. 1966); *State v. Kaiser,* 74 *N. J. Super.* 257, 273 (App. Div.), certif. den. 38 *N. J.* 310 (1962), aff'd 80 *N. J. Super.* 176 (App. Div. 1963), *cert.* den. 376 *U. S.* 950, 84 *S. Ct.* 966, 11 *L. Ed.* 2d 970, reh. den. 377 *U. S.* 913, 84 *S. Ct.* 1163, 12 *L. Ed.* 2d 184 (1964). *Cf. Venuto v. Lubik Oldsmobile, Inc.,* 70 *N. J. Super.* 221, 229 (App. Div. 1961); *Schult v. H. & C. Realty Corp.,* 53 *N. J. Super.* 128, 136 (App. Div. 1958), certif. den. 29 *N. J.* 279 (1959). However, though responsibility for a trial judge's errors may be shared with defendants, this does not obviate appellate consideration of their nature and impact upon the trial. In *State v. Harper,* 128 *N. J. Super.* 270, 278 (App. Div.), certif. den. 65 *N. J.* 574 (1974), the Appellate Division, while noting that trial errors "induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal", also observed:

We must recognize, however, that, although brought about by defendant, there are errors of such magnitude that they trench directly upon the proper discharge of the judicial function. Some errors "may go so plainly to the integrity of the proceedings that * * * a new trial is the just course." *State v. Macon,* * * * 57 *N. J.* [325] at 338 [1971]. We conceive that errors of this dimension may be cognizable on appeal as plain error notwithstanding their having been precipitated by a defendant at the trial level.

In this case, the application of the invited error rationale to foreclose appellate relief is dubious. Defense counsel may have acquiesced in the special interrogatories and the bifurcation procedure, but they did not request it. The trial court was not cozened or lulled into its mistake by defendants. Counsel for defendant Haussmann voiced misgivings about the procedure and specifically called the court's attention to the prejudicial impact of instructing the jury to assume the existence of a conspiracy in their deliberations. He sufficiently alerted the court to the potential problems of the special interrogatories. See *State v. Abbott*, 36 *N. J.* 63, 68 (1961) ("The important fact is that the trial court was alerted to the basic problem * * *."). In any event, the errors here committed were too serious in terms of the essential ingredients of a fair trial to be neglected on appellate review merely because defendants did not perceive their import and failed to protest their commission. *United States v. Bosch, supra,* 505 *F.* 2d at 79.

In this appeal, we are concerned with the court's duty to assure that the jury is able properly to discharge its most important responsibility in a criminal trial, determining guilt or innocence. *State v. Jackson, supra; Panko v. Flintkote, supra.* This judicial obligation, to assure the jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions, is at the core of the guarantee of a fair trial. *State v. Butler*, 27 *N. J.* 560, 594–598 (1958); *State v. Costa*, 11 *N. J.* 239, 249 (1953); see *United Brotherhood v. United States, supra.* Errors impacting directly upon these sensitive areas of a criminal trial are poor candidates for rehabilitation under the harmless error philosophy. The harmful effect of errors of this character cannot be readily measured by the empirical or objective assessment of the evidence bearing upon the defendant's guilt. For this reason, the rule of harmless error should be summoned only with great caution in dealing with the breach of fundamental procedural safeguards "designed to assure a fair trial". *Traynor,*

*The Riddle of Harmless Error* 81 (1970); Cameron and Osborne, "When Harmless Error Isn't Harmless", 1971 *Law & The Soc. Order* 23, 40. See *State v. Jackson, supra.* *Cf. State v. Deatore, supra.*

 This does not mean, of course, that an error involving important procedural aspects of a criminal trial can never be harmless. If such an error has not obviously detracted from securing and maintaining a fair and unbiased jury, *Wright v. Bernstein, supra,* 23 *N. J.* at 297–301 (Jacobs, J., dissenting), or has not demonstrably impaired the ability of the jury to deliberate impartially upon its verdict, a conviction should not be reversed. *Cf. State v. Trent,* 79 *N. J.* 251 (1979); *State v. Miller,* 76 *N. J.* 392 (1978). Similarly, if the error does not deflect the jury from a fair consideration of the competent evidence of record and from reaching a verdict of guilt which is supported overwhelmingly by properly admitted evidence, the conviction should not be impugned. *Cf. State v. Stefanelli,* 78 *N. J.* 418 (1979); *State v. LaPorte,* 62 *N. J.* 312, 318–320 (1973).

The errors confronting us in this case have the clear potential for perverting the juror's deliberative function. This is aptly illustrated in *United States v. Bosch, supra,* 505 *F.* 2d at 78–79 where the court stated with respect to the misuse of special interrogatories in a criminal trial:

> In criminal trials, any encroachment upon the broad right to a jury's general verdict of guilty or not guilty is fraught with danger. In the bright light of appellate hindsight, we can see that what appeared below as an efficacious and unexceptional procedure masked instead the path to error. The special interrogatories which were used to narrow the issues for the jury may have required them to return a verdict of guilty even though they found that all elements of the offense had not been proved. This possibility requires reversal despite the express acquiescence of the court appointed counsel for the defendant in the defective procedure.

The unique mischief inherent in the use of special interrogatories is their capacity to convert the jury to belief in guilt. A conviction of guilt arrived at by that course cannot there-

fore be rescued by resort to a search for overwhelming evidence of guilt. Regardless of whether a guilty verdict might be logical or sound in light of such evidence, "* * * the jury, as the conscience of the community, must be permitted to look at more than logic." *United States v. Spock, supra* at 182. If it has not been free to consult its own conscience, the historic power of the jury to return a verdict of not guilty, even if the proofs adduced at trial show unmistakably that an accused had committed an offense, has in effect been nullified. *Id.* at 180.

The errors of the trial court in this case satisfy the imposing requirements for plain error. The special interrogatories had the obvious capacity to "lead the [jury] down the guilty trail", *State v. Heald, supra,* 307 *A.* 2d at 193; it cannot be said beyond a reasonable doubt that they did not bring the jury "to a result it might otherwise not have reached". See *R.* 2:10–2. They were "clearly capable of producing an unjust result." *State v. Melvin,* 65 *N. J.* 1, 18–19 (1974); *State v. Macon,* 57 *N. J.* 325 (1971).

For these reasons, the convictions are reversed and the matter remanded for a new trial.

PASHMAN, J., dissenting. I dissent. I agree with the majority that special interrogatories, if improperly used, possess a potential to disrupt the proper functioning of a jury in a criminal case. Their utilization should therefore be prohibited in the absence of a court rule to the contrary. In this *particular* case, however, that potential did not come to fruition. Not only did the verdict procedure employed below not impact adversely upon defendants, it affirmatively aided their cause. Consequently, I am of the view that the error committed below could not possibly have "led the jury to a result it otherwise might not have reached." *State v. Macon,* 57 *N. J.* 325, 336 (1971); *see also State v. Melvin,* 65 *N. J.* 1, 18–19 (1974). Defendants' convictions should therefore be affirmed.

## I

The main reason underlying judicial disapproval of special interrogatories in criminal trials is that the use of such a verdict procedure, *if not carefully circumscribed,* may impermissibly "cathechize, color or coerce the jury's decision making." *Heald v. Mullaney,* 505 *F.* 2d 1241, 1246 (1st Cir. 1974), *cert.* den. 420 *U. S.* 955, 95 *S. Ct.* 1339, 43 *L. Ed.* 2d 432 (1975) ; *see, e. g., State v. Heald,* 307 *A*. 2d 188, 193 (Sup. Jud. Ct. Me. 1973). If such a result does come to pass, a defendant has been deprived of his right to be tried by a jury which is free from undue judicial control. *See, e. g., United States v. O'Looney,* 544 *F.* 2d 385, 392 (9th Cir. 1976), *cert.* den. 429 *U. S.* 1023, 97 *S. Ct.* 642, 50 *L. Ed.* 2d 625 (1976) ; *United States v. James,* 432 *F.* 2d 303, 307 (5th Cir. 1970), *cert.* den. 403 *U. S.* 906, 91 *S. Ct.* 2214, 29 *L. Ed.* 2d 682 (1971) ; *United States v. Spock,* 416 *F.* 2d 165, 181–182 (1st Cir. 1969) ; *United States v. Ogull,* 149 *F. Supp.* 272, 276 (S. D. N. Y. 1957), aff'd *sub nom. United States v. Gernie,* 252 *F.* 2d 664 (2d Cir.), *cert.* den. 356 *U. S.* 968, 78 *S. Ct.* 1006, 2 *L. Ed.* 2d 1073 (1958).

As the majority points out, however, the utilization of special interrogatories is not *per se* unconstitutional, nor will their use *always* undermine a jury's independence. See *ante* at 203–204. Given the proper circumstances, the submission of written questions to a jury might aid rather than obstruct the carrying out of its functions. Special interrogatories dealing with complex issues in a lengthy trial may assist jurors so that they can better perform their constitutional role. *See United States v. Ogull, supra.* Moreover, the use of written questions may be of invaluable aid to the judge in imposing sentence. *See United States v. Ogull, supra.* So long as the questions submitted "plainly lack any capacity to catechize, color or coerce the jury's decision making," their utilization would appear to be immune from constitutional attack. *Heald v. Mullaney, supra,* 505 *F.* 2d at 1246; *see also State v. Heald, supra,* 307 *A.* 2d at 193.

## II

I agree with the majority that this Court should not at present attempt to catalog every instance in which special interrogatories might aid, rather than obstruct, a jury's deliberations. Any decision in this regard should be made only after the Criminal Practice Committee and this Court have carefully scrutinized the matter and a rule explicitly allowing special interrogatories has been adopted. Our reluctance to examine the potential impact of interrogatories in every conceivable situation should not, however, lead us to ignore the *concrete* impact which the interrogatories here at issue had upon the particular case under review. *See, e. g., United States v. O'Looney, supra,* 544 *F.* 2d at 392–393; *United States v. James, supra,* 432 *F.* 2d at 308; *State v. Heald, supra,* 307 *A.* 2d at 193–196; *Commonwealth v. Beneficial Fin. Co.,* 360 *Mass.* 188, 275 *N. E.* 2d 33, 97 (Sup. Jud. Ct. 1971), *cert.* denied *sub noms. Farrell v. Massachusetts,* 407 *U. S.* 910, 92 *S. Ct.* 2433, 32 *L. Ed.* 2d 683 (1972) and *Benefiical Fin. Co. .v. Massachusetts,* 407 *U. S.* 914, 92 *S. Ct.* 2433, 32 *L. Ed.* 2d 689 (1972).

The trial judge below did not have the benefit of today's decision by this Court. Faced with a lengthy trial involving three defendants, twelve charged offenses, and an "intricate statute of limitations problem," see *ante* at 196, he was justifiably fearful that consideration of all the issues at one time would thoroughly confuse the jury — a confusion which might redound to defendants' detriment. It was for this reason that he considered the use of special interrogatories.

He adopted this procedure after consulting with all counsel. Although, in his view, a bifurcated verdict would result in a trial free from undue judicial pressure, he realized that he might have overlooked some element of prejudice to defendants' cause inhering in such a procedure.

At the close of the State's case — and thus well before the trial had come to a close — he therefore asked all counsel to comment upon the propriety of this procedure. Counsel

for defendant-Simon labeled the procedure "very fair." Counsel for Van Wettering remarked that he did not "have any problem with that." Counsel for Haussmann remained silent. Indeed, the *only* person to raise reservations concerning the propriety of the bifurcated verdict form was the *prosecutor*. In his view, this procedure would unduly prejudice the *State's* case.

It is with these factors in mind that we must review the interrogatories used below to determine whether the judge's error was indeed "clearly capable of producing an unjust result." *R.* 2:10–2; *State v. Melvin, supra,* 65 *N. J.* at 18–19; *State v. Macon, supra,* 57 *N. J.* at 336.

## III

Ample evidence was presented at trial from which a jury could reasonably conclude that defendants were guilty of the crimes charged against them. Various landowners and building contractors testified that they had been approached by Ferdinand Heinige or Edward Gorleski and informed that they had to "take care of the boys" on the Planning Board if their proposed construction projects were to be approved. Ferdinand Heinige, the State's star witness, stated that he had received illegal payments from these and other landowners, stored the monies in a safe at his home, and biannually distributed portions of these funds to Planning Board members, including defendants. He further testified that before the Planning Board formally convened in order to take action with respect to a particular matter, he would inform the members whether he had consummated a "deal" with the applicant. Applications from those who had in fact promised to make payments were always quickly and unanimously approved. Moreover, Heinige recollected making distributions from his safe to Planning Board members in December of 1969, distributions that were not solely derived from the proceeds of the "Swagger-Heinige transaction."

Russell Stocek, another member of the Planning Board in the 1960's, corroborated Heinige's testimony regarding

the informing of Planning Board members as to whether a "deal" existed with a particular applicant. Edward Gorleski — the borough's Building Inspector — testified that final payment of the money deriving from the Ledgewood Terrace transaction did not take place until December of 1969. Finally, Jerry Vozeh, a member of the Borough Council, stated that he had received payments from Heinige at the end of 1969.

More than sufficient evidence thus existed from which a jury could conclude beyond a reasonable doubt that these defendants had committed the substantive elements of the offenses charged against them and that these offenses had been perpetrated within the limitations period provided in *N. J. S. A.* 2A:159-2. It is true that defendants denied the existence of a tacit agreement to condition Planning Board approval upon the receipt of illegal payments, and that they maintained that no payments were made by Heinige in the latter part of 1969. However, it is not the province of an appellate court to weigh the credibility of witnesses who have testified at trial. That is the function of the jury.

Our sole inquiry is whether there exists "a reasonable doubt as to whether the error [committed below] led the jury to a result it otherwise might not have reached." *State v. Macon, supra,* 57 *N. J.* at 336, 273 A. 2d at 7; *see also State v. Melvin, supra,* 65 *N. J.* at 18–19. I find that no such doubt exists.

The questions submitted to the jury did not deal with each and every element of the offenses with which defendants were charged. Quite the contrary, only three specific matters were touched upon: (1) the existence of payments to defendants in December 1969; (2) the relation of the "Swagger-Heinige transaction" to the conspiracy in which these defendants allegedly participated; and (3) the existence of distributions of proceeds from the "Swagger-Heinige transaction" in December of 1969. These questions thus did not seek to elicit responses relating to whether defendants had committed any of the substantive elements of the offenses

with which they were charged. Rather, the interrogatories were designed to probe only the intricacies involved in the statute of limitations problem.

Contrary to the majority's assertions, the wording of the interrogatories did not unreasonably predispose the jury to return a general verdict of guilty. Prior to their submission, the judge instructed the jurors as to the legal significance of the terms "conspiracy" and "co-conspirators" and informed them that they would have to assume the existence of a conspiracy *only* when responding to Interrogatory II. Moreover, after the interrogatories had been answered, the judge emphasized that the jury could no longer assume the existence of a conspiracy when it retired to consider a general verdict.

The majority characterizes this later instruction as "a weak palliative * * * hardly to be expected to overcome the conscious or subconscious feelings as to guilt the jurors were impelled to develop in making the factual determinations * * * called for by the special interrogatories." See *ante* at 201–202. In effect, the majority deems the average juror intellectually incapable of applying the instructions given by a trial judge. The majority conveniently ignores the fact that our whole system of criminal justice is predicated upon the ability of laymen to comprehend and follow such instructions. Under the majority's thesis, therefore, *Evid. R.* 6 — a rule which requires a judge to give jurors a limiting instruction when evidence is admissible for one purpose but not for another purpose — serves no function whatsoever, inasmuch as any such instruction amounts at best to a "weak palliative."

I cannot accept such an anomalous result. The judge in the present case explicitly informed the jurors that they could not assume the existence of a conspiracy during their general verdict deliberations. In the absence of proof demonstrating the contrary, we must assume that the jurors — as intelligent laymen — were capable of following this charge. The majority's assertion that the jurors believed, consciously

or subconsciously, that the defendants were guilty is just that — an assertion supported neither by the record nor by scientific evidence of which we can take judicial notice.

It is noteworthy in this regard that had the trial judge not utilized a bifurcated verdict form, he would have been obliged to instruct the jurors as to the precise matters encompassed by the interrogatories prior to their general verdict deliberations. That is, he would have been compelled to inform the jury of the existence of the statute of limitations problem and the necessity of determining whether an overt act in furtherance of a conspiracy had occurred during the limitations period. In order that defendants' cause not be prejudiced, he could properly have charged that unless the jurors found (1) that a payment was made by Heinige to defendants or their co-conspirators in December of 1969 and (2) that any such payment was made as part of a conspiracy in which these defendants participated, they need not deliberate upon the substantive elements of the charged offenses, but instead should return a verdict of not guilty. Indeed, in view of the potentially dispositive nature of the statute of limitations question, he could properly have suggested that this matter be considered at the outset of the jurors' deliberations.

Although the procedure utilized in the present case differed in form from such a jury charge, in substance the two techniques are identical. Just as the charge would have been completely unobjectionable, so too did the written interrogatories not result in any prejudice to defendants' cause. Indeed, the use of special interrogatories had the distinct advantage — from defendants' viewpoint — of focusing the jurors' attention on the statute of limitations and therefore averting the possibility that the triers of fact would disregard the legal implications of a "technical" element of the offense which did not bear upon defendants' culpability.

The verdict procedure here utilized therefore did not "catechize, color or coerce the jury's decision making," *Heald v. Mullaney, supra,* 505 *F.* 2d at 1246; *see also United States*

v. *O'Looney,* 544 *F.* 2d 385, 392–393 (9th Cir.) *cert.* den. 429 *U. S.* 1023, 97 *S. Ct.* 642, 50 *L. Ed.* 2d 625 (1976); *United States v. James, supra,* 432 *F.* 2d at 308; *State v. Heald, supra,* 307 *A.* 2d at 193–196; *Commonwealth v. Beneficial Fin. Co.,* 360 *Mass.* 188, 275 *N. E.* 2d 33, 97 (Sup. Jud. Ct. 1971), *cert.* den. *sub noms. Farrell v. Massachusetts,* 407 *U. S.* 910, 92 *S. Ct.* 2433, 32 *L. Ed.* 2d 683 (1972) and *Beneficial Fin. Co. v. Massachusetts,* 407 *U. S.* 914, 92 *S. Ct.* 2433, 32 *L. Ed.* 2d 689 (1972). Not only did the verdict procedure not impact adversely upon defendants, it aided their cause. Had the jury returned with negative responses to the interrogatories, the case would have been at an end. Defendants were thus in effect given two chances to prevail on the merits. Indeed, the jury's response to the interrogatory dealing with the "Swagger-Heinige transaction" impacted favorably upon defendants' case. It removed that transaction from the conspiracy charged, thereby precluding its use to overcome the bar of the statute of limitations. It is therefore not surprising that counsel for all defendants approved of the bifurcated procedure, while the prosecutor complained that such a verdict form would undermine the chances of a conviction. *See United States v. James, supra,* 432 *F.* 2d at 308.

The majority today concludes that public officials who have breached the trust placed in them by the citizenry at large shall have yet another chance to argue their cause in court. Although the average citizen is given only one opportunity to prevail on the merits, Van Wettering and Haussmann are to be accorded three such opportunities. And this, merely because the majority deems jurors incapable of following the instructions of a judge.

I dissent. Justice SULLIVAN and Justice SCHREIBER join in this opinion.

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, CLIFFORD and HANDLER—4.

*For affirmance*—Justices SULLIVAN, PASHMAN and SCHREIBER—3.