834 A.2d 1087

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL W. BANKO, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 29, 2003—Decided November 18, 2003.

Before Judges PETRELLA, COLLESTER and FUENTES.

*John J. Scaliti,* Assistant Prosecutor, argued the cause for appellant (*John L. Molinelli,* Bergen County Prosecutor, attorney; *Mr. Scaliti* of counsel and on the brief).

*Donald Horowitz* argued the cause for respondent (*Mr. Horowitz* of counsel and on the brief; *Kelly Berton Rocco,* on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

The State appeals the order of the Law Division vacating a jury verdict convicting defendant of second-degree possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4a, and ordering a new trial. The same jury acquitted defendant of attempted aggravated sexual assault, *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:14–2a(4), first-degree kidnapping pursuant to *N.J.S.A.* 2C:13–1b(1) and fourth-degree aggravated assault by pointing a firearm, *N.J.S.A.* 2C:12–1b(4).

We originally denied the State's motion seeking leave to appeal the trial court's order. Thereafter, the Supreme Court granted the State's motion for leave to appeal and summarily remanded the case to us to consider the appeal on the merits. *State v. Banko,* 175 *N.J.* 426, 815 *A.2d* 475 (2003).

Although defendant did not file a cross-appeal, he nevertheless raises the following arguments:

I. THE DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE HIS EXCLUSION FROM JURY VOIR DIRE VIOLATED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL

II. THE DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE THE PUBLIC'S EXCLUSION FROM JURY VOIR DIRE VIOLATED HIS CONSTITUTIONAL RIGHTS AND DENIED HIM A FAIR TRIAL

III. THE DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE IMPERMISSIBLE FACTORS CREATED AN UNACCEPTABLE RISK THAT THE JURY'S VERDICT WOULD BE TAINTED IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS

a. The heightened security surrounding the handling of the BB gun throughout the trial created an unacceptable risk that the jury's opinion regarding the reasonableness of Carmen Miles'[s] alleged fear would be tainted

b. The prosecutor's and her witnesses' repeated failure to abide by the trial court's order to refer to Carmen Miles as the "alleged victim" created an unacceptable risk that the jury's verdict would be tainted

c. The trial judge's intrusive questioning of the defendant strongly suggested his disbelief of his testimony, substantially impacting the defendant's credibility, creating an unacceptable risk the jury's verdict would be tainted

IV. THE DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DENIED HIM A FAIR TRIAL

After a careful review of the record and the relevant law, we conclude that the jury's verdict finding defendant guilty of second-degree possession of a firearm for an unlawful purpose cannot stand.

The following salient facts were developed from the evidence presented at trial.

I

Defendant met the complaining witness, Carmen Miles, in the evening hours of April 30, 1999, at a Manhattan bar. The two had not known each other before that night. Miles and a co-worker, Carmen Hernandez, arrived at the bar first. Defendant arrived sometime thereafter in the company of an acquaintance, Raymond Surgey.

Defendant and Miles struck up a conversation. They discussed such topics as Miles's recent move to New York City from Georgia and her current relationship with her live-in boyfriend. At one point in the conversation, the topic of firearms came up. According to Miles, she remembers telling defendant that her father had taught her to handle "a small pistol, a .22 pistol" or a ".22 rifle." She recalls, however, that she was the one who introduced the topic of firearms into the conversation as a "joke" about her southern upbringing.

Miles also testified that defendant attempted to kiss her in the bar and talked about starting a relationship with her. She told him, however, that she was not interested because of her desire to maintain a relationship with her boyfriend. Defendant and Miles agreed that they both consumed a number of alcoholic beverages while at the bar. At approximately 9:00 p.m., Miles announced that she was leaving to catch the last Port Authority bus home at 9:30 p.m. The group, including defendant, persuaded her to stay and dine at another restaurant/bar. Surgey offered Miles to have his car service take her home. She agreed and the foursome proceeded to the restaurant in Surgey's chauffeur-driven car service.

After dinner and dancing, Miles again voiced her desire to leave with the hope of getting home by 1:00 a.m. After some discussion, Miles decided to leave with defendant using Surgey's car service. She anticipated that the driver would take defendant home first and then proceed to take her to her house. At trial, the parties gave different accounts of what transpired during the car ride. Defendant testified that they kissed. Miles denied this. Defendant claimed that Miles willingly went inside his apartment. Miles said that defendant "tugged" her arm and said that he wanted her to follow him in order to get another car service to take her home.

The parties differ dramatically on what occurred once they went inside defendant's apartment. Miles testified that once inside, she waited by the outer door while defendant used the restroom. She kept her coat, purse and bag on or near her person as she waited for defendant to exit the restroom and call a car service. After several minutes, defendant left the bathroom and walked into a room Miles assumed was the bedroom. Defendant re-entered the area where Miles was standing armed with a handgun. He pointed the weapon at Miles and cautioned her not to scream. She began to cry and shake and repeatedly requested that defendant allow her to leave. Defendant, according to Miles, seemed agitated and reminded her that: "Nobody knows who you're with and no one knows where you are, no one will find you."

Defendant instructed Miles to sit down on a nearby couch. She situated herself at the end closest to the door in case an escape opportunity presented itself. She placed her coat and bags at the opposite end of the couch. At this point defendant, with the gun still in his hands, graphically told Miles that they were going to have sexual intercourse and play "strip poker." Miles testified that she decided to play along to calm defendant down. She removed her shoes and helped him unbutton his shirt "to make him think that I was going to do what he wanted."

At some point, defendant kissed Miles. He also told her that he was thirty-five years old and was having problems with his job and

his girlfriend. Miles again tried to play along and pacify defendant by telling him that she did not believe he was that old, asking him to show her identification. He complied.

Defendant eventually placed the gun down and inexplicably asked Miles where his playing cards were located. She replied that they might be in a kitchen drawer. As defendant headed toward the kitchen to obtain the cards, Miles seized the opportunity and made her escape through a door, running shoeless down the stairs screaming: "He's going to kill me, he's going to kill me, he's going to kill me." In her haste, she fell down, sustaining bruises and other minor injuries. She banged on apartment doors in the building until one opened and she was pulled inside.

As previously indicated, defendant's testimony painted a totally different picture. According to defendant, Miles willingly came up to his apartment. Once inside, he asked her to remove her shoes so as not to disturb his neighbors. She complied without hesitation, placing her shoes and bags underneath a chair. He used the bathroom while she made herself comfortable. They sat on the couch and talked about different topics, including the potential for developing a romantic relationship.

Based on the tenor of the conversation, defendant felt free to ask Miles whether she wanted to play "strip poker." When she agreed, defendant went into the kitchen to look for playing cards. Upon his return, he brought with him a BB gun to "probably [try] to impress her in my own drunken way, or stupid way." He said he had acquired the gun to fulfill a youth-hood desire. In an effort to alleviate any possible anxiety on Mile's part, he pointed the BB gun at the television and pulled the trigger to demonstrate it was not loaded.

According to defendant, Miles picked up the gun and expressed surprise at its likeness to a "real" firearm. He then offered it to her for defense against her boyfriend. Defendant testified Miles had previously stated that she was unhappy in that relationship. According to defendant, his offer apparently reminded Miles of this sensitive topic, causing her to become increasingly upset.

Defendant continued to hold the BB gun, cocking it a few times. He then slid it back under the couch.

In light of Miles's emotional state, defendant decided to call a cab for her. He thus proceeded to his bedroom to make the call. While in the room, he heard the screen door bang. When he came out, Miles was gone. He waited by the window for her to return. Ten minutes later he heard a scream and saw cars pull into the parking lot. He returned to his couch and watched television, eventually falling asleep with the lights on and the front door open.

Miles's account of what transpired immediately after she left defendant's apartment was corroborated by independent witnesses. Michael Chasen, a resident of an apartment located around the corner from defendant's apartment, testified that he heard Miles's "frantic" cries and immediately dialed 911 to summon the police. Arnold and Carol Nussbaum, also residents in defendant's building, testified that they were awakened by the commotion. Mr. Nussbaum responded to the banging on his window and door by asking his wife to call 911. He then opened his door to pull the person who was crying for help inside his apartment. Nussbaum testified that he did not see any indication that Miles was under the influence of drugs or alcohol.

The police arrived at Nussbaum's apartment shortly thereafter and transported Miles to the Englewood police station where she was questioned and treated by paramedics for abrasions sustained. The police eventually took Miles back to the apartment complex, but she was unable to identify defendant's apartment.

Several days after, Miles called the police investigators to report that defendant had left several voice mail messages at her work identifying himself as "Michael McCabe." In the messages, he offered to return to her the personal items she had left in his apartment. Armed with this information, the police were able to locate defendant and identify his apartment which was registered under the name of "Michael Banko."

When questioned by law enforcement officers, defendant admitted that Miles had been in his apartment and that he owned a BB gun. The police recovered the weapon underneath defendant's bed. Inside the trunk of defendant's car, the police also recovered Miles's raincoat, pocketbook, book bag and shoes.

The trial court gave the following instructions to the jury on the charge of possession of a firearm for an unlawful purpose:

> The Fourth Count of the indictment charges the defendant, Michael Banko, also known as Michael McCabe, with the crime of possession of a firearm with the purpose to use it unlawfully against a person. The statute on which the count of the indictment is based reads in pertinent part, "Any person who has in his possession any firearm with a purpose to use it unlawfully against a person is guilty of a crime."

> In order for you to find the defendant guilty of this charge, the State has the burden of proving beyond a reasonable doubt each of the following four elements of this crime:

> Number 1, [that the BB gun] is a firearm.

> Number 2, the defendant possessed the firearm.

> Number 3, the defendant possessed the firearm with the purpose to use it against a person.

> Number 4, the defendant's purpose was to use the firearm unlawfully.

The only element in contention here is number four. As to that question, the judge gave the following instructions to the jury:

> The fourth element that the State must prove beyond a reasonable doubt is that the defendant had a purpose to use the firearm in a manner that is prohibited by law. I've already defined purpose for you. This element provides that you find that the State has proven beyond a reasonable doubt that the defendant possessed the firearm with the conscious objective, design or specific intent to use it against a person in an unlawful manner as charged in the indictment and not for some other purpose.

> *In this case the State contends that the defendant's unlawful purpose in possessing the firearm was to unlawfully confine Carmen Miles with the purpose to commit the crime of aggravated sexual assault upon Carmen Miles.*

> *You must not rely on your own notions of the unlawful purpose of the defendant. Rather, you must consider whether the State has proven the specific unlawful purpose charged. The unlawful purpose alleged by the State may be inferred from all that was said or done and from all the surrounding circumstances of this case.*

> (emphasis added.)

In the course of deliberations, the jury sent out numerous notes with questions on a variety of topics. With respect to the unlawful purpose charge, the jury asked the following question:

> It is our reading of the counts that if a guilty verdict is found in Count 4 [possession of the B.B. gun for an unlawful purpose] a guilty verdict must also be found on either aggravated sexual assault or kidnapping. We believe this specifically [sic] the fourth element states: In this case the State contends that the defendant's unlawful purpose in possessing the firearm was to unlawfully confine Carmen Miles for the purpose to commit the crime of aggravated sexual assault on Carmen Miles.

After conferring with counsel, the trial court reminded the jury of its obligation to consider each offense separately and to render a verdict as to each count. After being so advised, the jury foreperson indicated that the court's statements were not responsive to the jury's concern. This was reflected in the following exchange:

> THE COURT: Does that answer your question?
>
> THE FOREPERSON: I don't think so.
>
> THE COURT: Well, perhaps it may be helpful, you must render a verdict as to each count individually. Does that help you?
>
> THE FOREPERSON: Somewhat. I don't know if we're allowed to articulate our concern.
>
> THE COURT: Why don't you do this? Keeping in mind each count is a separate offense and you have to render your verdict as to each charge. If you have a further question let me know.

The jury did not ask any further questions on this topic.

Against this factual backdrop, we will now address the State's argument.

## II

The State contends that the jury's verdict convicting defendant of possession of the BB gun for an unlawful purpose must be sustained because defendant could have possessed the weapon with the intent to sexually assault Miles, without having taken the "substantial step" necessary to constitute an attempt under *N.J.S.A.* 2C:5–1a(3). We disagree.

To establish criminal attempt, the State must prove that defendant had the criminal purpose to commit the offense *and* also took a substantial step toward the commission of the object crime. As recently noted by the Supreme Court, "a substantial step is conduct by an accused that strongly corroborates his or her alleged criminal purpose." *State v. Perez,* 177 *N.J.* 540, 553, 832 *A.*2d 303 (2003); *see also State v. Fornino,* 223 *N.J.Super.* 531, 538, 539 *A.*2d 301, (App.Div.), *certif. denied sub nom., State v. Fornino,* 111 *N.J.* 570, 546 *A.*2d 499, *cert. denied,* 488 *U.S.* 859, 109 *S.Ct.* 152, 102 *L. Ed.*2d 123 (1988).

The object crime here was an aggravated sexual assault. The evidence of the "substantial step" taken by defendant to attempt the aggravated sexual assault was, according to Miles, defendant emerging from the bedroom armed with the BB gun, and graphically demanding sex. In acquitting defendant, the jury rejected this evidence. Notably, this was also the only evidence of defendant's unlawful purpose. Up to this point in time, there is no evidence that defendant's lawful purpose in possessing the BB gun was converted into the unlawful purpose of facilitating the sexual assault upon Miles.

 Possession of a firearm with the purpose to use it unlawfully "is, by nature, an inchoate offense." *State v. Harmon,* 104 *N.J.* 189, 203, 516 *A.*2d 1047 (1986). Thus, an analysis of this crime, "turns on the purpose for which defendant possessed the gun and not how he used it." *State v. Blanks,* 313 *N.J.Super.* 55, 73, 712 *A.*2d 698 (App.Div.1998). Defendant's "state of mind" is critical to establish his innocence or guilt and is often the central issue for the jury to resolve. *Harmon, supra,* 104 *N.J.* at 205, 516 *A.*2d 1047. Furthermore, because:

A jury is not qualified to say without guidance which purposes for possessing a weapon are unlawful and which are not. Therefore, a jury instruction on a charge of possession of a weapon for an unlawful purpose *must* include an identification of the unlawful purpose or purposes suggested by the evidence and an instruction that the jury "may not convict based on their own notion of the unlawfulness of some other undescribed purpose." In addition, the trial judge *should* explain to the jury that the criminal purpose or state of mind may exist at whatever time the

State claims that the possessory offense took place, and relate the specific unlawful purpose charge to the facts of the case.

[*State v. Villar,* 150 *N.J.* 503, 511, 696 *A.*2d 674 (1997), *certif. denied,* 155 *N.J.* 587, 715 *A.*2d 990 (1998). (emphasis added) (citations omitted).]

We glean from the use of the word "must" that the Court intended to describe a set of mandatory elements to be included in every jury charge involving the crime of possession of a weapon for an unlawful purpose. By contrast, we interpret the word "should" to confer upon the trial judge a certain degree of discretion to determine under what circumstances this additional instruction "should" be included as part of the charge.

We are satisfied that under both *Harmon* and *Villar,* these additional instructions "should" be included as part of the charge of possession of a firearm for an unlawful purpose when defendant's original purpose in possessing the weapon was lawful, and his defense to the charge is that his purpose remained lawful throughout the time the State alleges the offense took place. As Justice O'Hern explained in *Villar,* if a homeowner used a lawful and otherwise innocuous household object "for the purpose of assaulting a spouse, the homeowner should be prosecuted for the possession of the previously benign object for the unlawful purpose of inflicting bodily injury on another." *Villar, supra,* 150 *N.J.* at 513, 696 *A.*2d 674.

Here, defendant asserts that his original purpose in possessing the BB gun was lawful and that it remained lawful throughout his encounter with Miles. The State's theory of culpability is predicated upon defendant's state of mind at the critical point in time when defendant comes out of the bedroom armed with the BB gun and allegedly threatens Miles. The prosecutor made this clear in her summation:

Obviously, we have to show that the defendant possessed the firearm, that the unlawful purpose in this case was that once she was in the apartment, that is when the possession of the weapon became for an unlawful purpose. *Once he began to threaten Carmen Miles with that weapon, to demand sex, that is when it becomes a weapon in your possession, and you are using it to confine somebody to attempt to commit an aggravated attempted sexual assault.* (emphasis added.)

Although the trial judge's charge here specifically identified the unlawful purpose as aggravated sexual assault; instructed the jury as to the elements of that offense; and admonished them not to consider their own notion of other possible unlawful purposes, it did not explain to the jury at which point in time the State claimed defendant's lawful purpose in possessing the BB gun became unlawful. The court also did not relate the charge to the facts of the case.

An appropriate jury charge is an indispensable component of a fair trial. *State v. Brown,* 138 *N.J.* 481, 522, 651 *A.*2d 19 (1994); *see also State v. Martini,* 131 *N.J.* 176, 271, 619 *A.*2d 1208 (1993), *cert. denied, sub nom., Martini v. New Jersey,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995). "A [jury] charge is a road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990). Furthermore, "so critical is the need for accuracy that erroneous instructions on material points are presumed to be reversible error," *ibid.,* and "are ordinarily considered 'poor candidates for rehabilitation under the harmless error philosophy.'" *State v. Harmon, supra,* 104 *N.J.* at 213, 516 *A.*2d 1047 (quoting *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979)).

Under the circumstances presented here, we conclude that the trial court's failure to properly instruct the jury as to which point in time the State claimed defendant's lawful purpose in possessing the BB gun became unlawful, deprived the jury of crucial guidance on a critical element of the offense. The jury's question on this topic is indicative of the level of difficulty it was experiencing as it grappled with the subtle complexities of this issue. In fact, when faced with a direct inquiry from the jury on this critically important issue, the court had an obligation to provide responsive legal guidance. *State v. Savage,* 172 *N.J.* 374, 394–95, 799 *A.*2d 477 (2002); *State v. Conway,* 193 *N.J.Super.* 133, 157, 472 *A.*2d 588 (App.Div.), *certif. denied,* 97 *N.J.* 651, 483 *A.*2d

174 (1984). Its failure to do so here exacerbated an already analytically difficult problem.

■ Inconsistent verdicts are normally permitted "so long as the evidence was sufficient to establish guilt on the substantive offenses beyond a reasonable doubt." *State v. Petties*, 139 *N.J.* 310, 319, 654 *A.*2d 979 (1995), (quoting *State v. Kamienski*, 254 *N.J.Super.* 75, 95, 603 *A.*2d 78 (App.Div.), *certif. denied*, 130 *N.J.* 18, 611 *A.*2d 656 (1992)). We disagree with the trial judge's reliance on that principle in setting aside the verdict. However, in light of the jury's acquittal on the charge of attempted aggravated sexual assault, we are satisfied that there is no evidence to sustain the jury's guilty verdict on the charge of possession of the BB gun for an unlawful purpose.

### III

This case is before us on leave granted to the State by the Supreme Court. Defendant did not file a cross-motion for leave to appeal. Thus, the issues raised by defendant here are not properly before us and we will not address them.

### IV

The State concedes that if the jury's verdict as to *N.J.S.A.* 2C:39–4a cannot stand, the appropriate disposition would be the entry of a judgment of acquittal pursuant to *R.* 3:18–2, and not, as the trial judge ruled here, an order for a new trial. We agree. The order of the Criminal Part, vacating the jury's verdict finding defendant guilty of second-degree possession of a firearm for an unlawful purpose, is affirmed. The part of the order directing a new trial is vacated and the matter is remanded for the entry of a judgment of acquittal.