**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4412-16T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSE TEPANECATLTEPALE,
a/k/a JOSE M. TEPALE,

     Defendant-Appellant.

_____

Submitted February 6, 2019 – Decided February 19, 2019

Before Judges Reisner and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 16-07-0592.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Deputy Public Defender II, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jose Tepanecatltepale appeals from an April 21, 2017 judgment of conviction following a jury trial for first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(a); and fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d). We affirm.

The following facts are taken from the record. Beginning in January 2016, the victim, Fidel Cabrera, rented a room in the first-floor apartment of a residence located on Center Street in Clifton. Cabrera's room was rented from Jorge Mesa, who had rented the entire three-bedroom apartment from the owner, and sublet the two remaining bedrooms to Cabrera and defendant. Cabrera had not met defendant before the night of the incident because he had a different work schedule, and defendant had only been living in his room for approximately three weeks.

On January 10, 2016, at approximately 1:00 a.m., Cabrera entered the hallway of the apartment. A man opened the door, emerged from the middle bedroom, and approached him. The man grabbed Cabrera by the shoulder, said "hello friend" in Spanish, and stabbed him in the stomach. Cabrera pushed the man back, retreated to his bedroom, and locked the door. Cabrera called 9-1-1

and said "[a] guy stabbed me, he lives here, he stabbed me." Cabrera was hospitalized and had emergency surgery to repair a punctured colon and lacerated liver.

Police responded to the residence and found no signs of forced entry. They discovered a bloodstained shirt on the floor of the apartment and surveillance footage from a bar next door, which showed a shirtless man running at approximately 1:30 a.m.

Detective Michael Panepinto interviewed Cabrera at the hospital. Cabrera stated he had never met defendant. When Cabrera returned home from the hospital, he observed defendant moving belongings out of the middle bedroom. Cabrera called Panepinto and told him he recognized defendant as the individual who stabbed him. Panepinto assembled a photographic array containing one photo of defendant and five other individuals. Cabrera identified defendant's photo from the array and indicated he was sixty-to-seventy percent certain it depicted the man who stabbed him.

At trial, Cabrera testified the light in the middle bedroom was on and provided enough illumination for him to see defendant's face during the attack. Cabrera also identified defendant in court. He stated the only discrepancy was that defendant's face looked "chubbier" in the photograph than it did in person.

After defendant was arrested, he gave police a video recorded statement, which was also played for the jury. In it, defendant stated he worked at a local delicatessen until 3:00 p.m. and then returned home. He then visited his sister's home from 5:30 p.m. to 7:30 p.m. and stopped at a local sports bar on the way home at approximately 8:30 or 9:00 p.m. Defendant stated he consumed approximately four or five beers and stayed at the bar until 11:00 p.m. He stated he was not intoxicated and was "stabilized."

He then left the bar for his sister's home, where he stayed until 12:30 a.m. Defendant stated he went to the Ukrainian Center in Passaic to see his brother perform. There he drank four more beers and walked home. Defendant stated he "blacked out" around 1:30 a.m. and woke up at his brother's house, which was located several blocks from his apartment. Defendant claimed he had a history of blacking out, which he believed was caused by repeated head trauma.

Defendant stated he woke up in the clothes he had been wearing the night before. He claimed he learned of the stabbing when he returned home at 10:00 a.m. Defendant stated he had never met Cabrera because defendant worked often and slept when he returned home.

In addition to the aforementioned evidence, Mesa testified a knife was missing from the apartment. The knife used in the incident was never recovered.

4

Mesa also testified his bedroom door was shut at the time of the incident and he did not see anything, but heard a noise which sounded like someone running out of the apartment.

Defendant did not testify at trial. However, his attorney argued that defendant was mistakenly identified as the attacker because he was asleep at his brother's home at the time of the stabbing. Defense counsel also argued that defendant lacked motive to commit the crime and asserted the more likely explanation was Cabrera had interrupted a burglary by an unknown assailant, who had crawled through the middle bedroom window and stabbed him.

Defendant was convicted on all counts and sentenced to an aggregate term of thirteen years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. This appeal followed.

Defendant raises the following points on appeal.

> POINT I - WHERE IDENTIFICATION WAS THE CENTRAL ISSUE IN THE CASE, TWO SIGNIFICANT ERRORS IN THE IDENTIFICATION JURY INSTRUCTION DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).
>
> . . . .
>
> B.   THE COURT INSTRUCTED THE JURY THAT TWO WITNESSES IDENTIFIED DEFENDANT AS THE

A-4412-16T2

ASSAILANT WHEN, IN FACT, ONLY ONE DID.

C.    THE COURT FAILED TO GUIDE THE JURY ON HOW PRE-IDENTIFICATION INSTRUCTIONS ADMINISTERED TO THE VICTIM COULD BE TAKEN INTO ACCOUNT WHEN EVALUATING THE IDENTIFICATION EVIDENCE.

. . . .

POINT II – PROSECUTORIAL ERROR IN THE OPENING STATEMENT DENIED DEFENDANT A FAIR TRIAL.  (Not Raised Below).

POINT III – THE TRIAL COURT'S FAILURE TO SUA SPONTE CHARGE THE DEFENSE OF INTOXICATION DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.  (Not Raised Below).

I.

"[A]ppellate courts are empowered, even in the absence of an objection, to acknowledge and address trial error if it is 'of such a nature as to have been clearly capable of producing an unjust result[.]'"  State v. Robinson, 200 N.J. 1, 20 (2009) (quoting R. 1:7-5).  "Further, our appellate courts retain the inherent authority to 'notice plain error not brought to the attention of the trial court[,]' provided it is 'in the interests of justice' to do so."  Ibid. (alteration in original) (quoting R. 2:10-2).  "Under that [plain error] standard, defendant has the burden

6

of proving that the error was clear and obvious and that it affected his substantial rights." State v. Morton, 155 N.J. 383, 421 (1998).

"Correct jury charges are essential to a fair trial and failure to provide a clear and correct charge may constitute plain error." State v. Holden, 364 N.J. Super. 504, 514 (App. Div. 2003). Indeed, erroneous instructions on matters or issues that are material to the jury's decision are presumed to be reversible error. State v. Warren, 104 N.J. 571, 578-79 (1986). Moreover, if a jury instruction is particularly "crucial to the jury's deliberations on the guilt of a criminal defendant," then "'[e]rrors [having a direct impact] upon these sensitive areas of a criminal trial are poor candidates for rehabilitation' under the plain error theory." State v. Jordan, 147 N.J. 409, 422-23 (1997) (quoting State v. Simon, 79 N.J. 191, 206 (1979)).

"The trial court must give a clear explanation of the applicable law to provide the jury with an adequate understanding of the relevant legal principles." State v. Hackett, 166 N.J. 66, 85 (2001) (citing State v. Burgess, 154 N.J. 181 (1988)). In reviewing any claim of error "[t]he charge must be read as a whole in determining whether there was any error[,]" State v. Torres, 183 N.J. 554, 564 (2005), and the effect of any error must be considered "in light 'of the overall

strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting

State v. Chapland, 187 N.J. 275, 289 (2006)).

A.

Defendant argues the trial judge erroneously attributed defendant's identification to Panepinto, who was "only involved in producing the photographic array." Specifically, defendant challenges the following passage from the jury charge on identification:

> The State has presented the testimony of . . . Cabrera and . . . Panepinto. You will recall that these witnesses identified the defendant in court as the person who committed attempted murder, aggravated[] assault, possession of a weapon for [an] unlawful purpose and unlawful possession of a weapon.
>
> The State also presented testimony that on a prior occasion before this trial, these witnesses identified the defendant as the person who committed these offenses.
>
> According to the witnesses, their identification of the defendant is based upon the observations and perceptions that they made of the perpetrator at the time the offense was being committed.

The aforementioned statement did not constitute reversible error. At the outset, we note defendant did not object to the instruction.[1] This is because

---

[1] Counsel's failure to object to jury instructions not only "gives rise to a presumption that he did not view [the charge] as prejudicial to his client's

Panepinto identified defendant in court as the individual he arrested and charged with committing the offense. Panepinto explained defendant's arrest was based on the information he obtained during his investigation, namely, the observations he made immediately after the incident, at the scene, and the interviews of Cabrera and defendant. In the context of this case, the instruction would not have confused the jury and was not capable of creating an unjust result. Hence, we find no plain error.

Defendant claims the State failed to elicit evidence regarding the instructions Cabrera was given prior to the photo array identification of defendant. He argues the judge should have read the jury the model charge for in-court and out-of-court identifications. He asserts the failure to provide the instruction "deprived the jury of the information it needed to properly assess the identification."

Generally, "a model identification charge should be given in every case in which identification is a legitimate issue," State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003), which requires instruction "about the various factors that may affect the reliability of an identification[.]" State v. Henderson, 208 N.J.

---

case[,]" State v. McGraw, 129 N.J. 68, 80 (1992), but is also "considered a waiver to object to the instruction on appeal." State v. Maloney, 216 N.J. 91, 104 (2013).

208, 296 (2011). Whether the failure to provide a jury instruction regarding identification is "plain error depends on the strength and quality of the State's corroborative evidence rather than on whether defendant's misidentification argument is convincing." State v. Cotto, 182 N.J. 316, 326 (2005). Thus, the failure to provide a jury instruction regarding identity is not error when there "exists substantial corroborating evidence, where the identification of the witness is positive, certain and consistent, or where defense counsel is able to attack the credibility of identification testimony through cross-examination and closing argument." State v. Salaam, 225 N.J. Super. 66, 71 (App. Div. 1988) (citations omitted).

Again, we note defendant did not object to the jury instruction. Notwithstanding, the judge gave a thorough and extensive instruction, which addressed the State's burden of proving the identity of defendant and the elements of the offenses charged, the in-court and out-of-court witness identifications of defendant, and the nature of the photo array identification process. After describing the latter, the judge stated the following:

> In this case, it [is] alleged that the person who presented the lineup knew the identity of the suspect and it is also alleged that the police . . . did not compensate for that fact by conducting the procedure in which the officer did not see the photos as the witness looked at them.

You may consider this factor when you consider the circumstances under which the identification was made and when you evaluate the overall reliability of the identification. You may consider whether the witness was exposed to opinions, descriptions or identifications given by other witnesses to photographs or newspaper accounts or to any other information or influence that may have affected the independence of his or her identification.

Such information can affect the independent nature and reliability of a witness' identification and inflate the witness' confidence in the identification. You are also free to consider any other factor based on the evidence or lack of evidence in the case that you consider relevant to your determination whether the identifications were reliable.

. . . .

The ultimate issue of the trustworthiness of an identification is for you to decide. If after consideration of all of the evidence you determine that the [S]tate has not proven beyond a reasonable doubt that [defendant] was the person who committed these offenses, then you must find him not guilty.

Considering the jury charge as a whole and in light of the overall strength of the State's case, as we must, we find no cause to reverse. The jury charge here was extensive, and we have only recited a portion of it. Moreover, neither side presented evidence concerning the instructions given to Cabrera prior to being shown the photo array. Thus, it was not an issue of concern for the jury.

Regardless, Cabrera identified defendant as the attacker before he ever saw the photo array, and he identified him in court. Therefore, the failure to include the model instruction on the photo array identification was not reversible error.

B.

Defendant claims the court's failure to charge the defense of intoxication denied him due process and a fair trial. He asserts "[t]he evidence was undisputed that [he] was so severely intoxicated that he 'blacked out' and had no memory of the night after about 1:30 a.m." He asserts under these circumstances, "an instruction on intoxication was clearly indicated by the record."

"[W]hen the requisite culpability for a crime is that the person act 'purposely' or 'knowingly,' evidence of voluntary intoxication is admissible to disprove that requisite mental state." State v. Cameron, 104 N.J. 42, 53 (1986). In order for intoxication to diminish "the capacity to act purposely or knowingly, the intoxication must be of an extremely high level; it must have caused a 'prostration of faculties' in the defendant." State v. Sette, 259 N.J. Super. 156, 170 (App, Div. 1992) (quoting Cameron, 104 N.J. at 54). "[A] jury issue arises only if there exists a rational basis for the conclusion that defendant's 'faculties'

were so 'prostrated' that he or she was incapable of forming an intent to commit the crime." State v. Mauricio, 117 N.J. 402, 418-19 (1990).

In Cameron, our Supreme Court addressed the extreme level of intoxication necessary to satisfy the "prostration of faculties" test. The Court stated:

> [I]t is not the case that every defendant who has had a few drinks may successfully urge the defense. The mere intake of even large quantities of alcohol will not suffice. Moreover, the defense cannot be established solely by showing that the defendant might not have committed the offense had he been sober. What is required is a showing of such a great prostration of the faculties that the requisite mental state was totally lacking. That is, to successfully invoke the defense, an accused must show that he was so intoxicated that he did not have the intent to commit an offense. Such a state of affairs will likely exist in very few cases.
>
> [Cameron, 104 N.J. at 54 (alteration in original) (citation omitted) (quoting State v. Stasio, 78 N.J. 467, 495 (1979)).]

Futher, the Court noted:

> [S]ome of the factors pertinent to the determination of intoxication sufficient to satisfy the test of "prostration of faculties" . . . are the following: the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others (what he said, how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested itself), any odor of alcohol or other intoxicating substance, the results of

13

any tests to determine blood-alcohol content, and the actor's ability to recall significant events.

[Cameron, 104 N.J. at 56.]

The defendant in Cameron had stated she felt "'pretty intoxicated,' 'pretty bad,' and 'very intoxicated.'" Ibid. The Court in Cameron found a voluntary intoxication instruction was not warranted because the statements were "no more than conclusory labels, of little assistance in determining whether any drinking produced a prostration of faculties." Ibid.

In State v. R.T., 411 N.J. Super. 35 (App. Div. 2009), we reviewed the factors set forth in Cameron in the context of a sua sponte jury instruction on voluntary intoxication. 411 N.J. Super. at 50-51. In R.T., the defendant confessed to police that he drank excessively and potentially molested his nephew while intoxicated. Id. 40-41. We noted the lack of blood alcohol tests and other indicia of alcohol consumption, such as an odor, to corroborate his claim of alcohol consumption. Id. at 50. Moreover, the victim only corroborated that defendant had a drinking habit. Id. at 51. We concluded the "evidence would be entirely insufficient to establish the extremely high level of intoxication required by the [c]ourt to qualify as a defense as well as to create a jury question on defendant's intoxication." Ibid.

A-4412-16T2

Here, defendant's claims regarding his intoxication were based solely on his own uncorroborated testimony. Defendant told police he did not feel intoxicated after drinking at a bar between 8:00 and 9:00 p.m., before the incident. He also stated he did not feel intoxicated at approximately 11:00 p.m. and instead felt "stabilized." Despite his alcohol consumption, defendant stated he was "still able to control [him]self" and only felt "a little drowsy." Defendant stated his blackout was not due to alcohol consumption, but a history of head trauma. Thus, the record lacked any evidence of intoxication, and contained evidence to the contrary. For these reasons, the trial judge did not err by failing to instruct the jury on a voluntary intoxication defense.

## II.

Defendant argues the prosecutor's opening statement informed the jury Panepinto had concluded defendant was the perpetrator of the crime, and this comment deprived him of a fair trial. Specifically, defendant points to the following statements by the prosecutor:

> In his investigation [Panepinto] was trying to eliminate suspects and eliminate alternative theories, so he could come to the right conclusion.
>
> Now, through his review of the scene, the collection of evidence, and speaking to witnesses, . . . Panepinto was able to definitively conclude that it was,

15

> in fact, the defendant who had stabbed . . . Cabrera in
> that first-floor apartment . . . on January 10th, 2016.

Opening statements and summations of counsel are not evidence. State v. Timmendequas, 161 N.J. 515, 578 (1999). The purpose of opening statements are to better prepare the jury to understand the evidence, and such statements are limited to the facts that counsel intends to prove. State v. Wakefield, 190 N.J. 397, 442 (2007).

Prosecutorial misconduct is not a basis for reversal unless the conduct "was so egregious that it deprived [the] defendant of a fair trial." State v. DiFrisco, 137 N.J. 434, 474 (1994) (quoting State v. Pennington, 119 N.J. 547, 565 (1990)). That is, the prosecutor's conduct must have been "'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Wakefield, 190 N.J. at 438 (quoting State v. Papasavvas (I), 163 N.J. 565, 625 (2000)). Considerable leeway is afforded to prosecutors in presenting their arguments at trial "as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). However, a prosecutor must not "express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." State v.

Marshall, 123 N.J. 1, 154 (1991) (quoting ABA Standards For Criminal Justice, §3-5.8(b) (2d ed. 1980)).

When, as here, a defendant fails to object to the prosecutor's comments at trial, the allegedly "improper remarks . . . will not be deemed prejudicial." Timmendequas, 161 N.J. at 576. Notwithstanding defendant's failure to object, he relies on State v. Rivera, 437 N.J. Super. 434 (App. Div. 2014), a case that is clearly distinguishable. There, the prosecutor's opening included a PowerPoint presentation, which declared "Defendant: GUILTY OF: ATTEMPTED MURDER." Id. at 447 (emphasis omitted).

Here, during his opening statement, the prosecutor had already informed the jury that Cabrera identified defendant as the individual who stabbed him, before addressing the police investigation. Based on Cabrera's identification, the prosecutor stated Panepinto's investigation led him to conclude defendant had committed the stabbing and left the jury to decide the result based on the evidence. Taken in context, the prosecutor's remarks on the investigation explained what the State intended to prove and the evidence it would present at trial, and did not impart an opinion on the veracity of the evidence.

The trial judge's instruction to the jury prior to the start of trial reinforced these principles. In pertinent part, the judge stated:

The first order of business will be the prosecutor's opening statement. In the opening statement, the prosecutor will present the State's contentions and will outline what he expects to prove. Following that, defense counsel if he chooses will make an opening statement.

What is said in opening statements is not evidence. The evidence will come from the witnesses [who] testify and from whatever documents [or] tangible items that are received into evidence.

The judge repeated a similar instruction before the jury deliberated. Additionally, the jury received detailed instructions regarding the elements of the crimes charged, including the mens rea required to prove them. Thus, the jury was clearly informed as to the distinction between evidence and argument. Finally, considering the substantial evidence supporting defendant's guilt the prosecutor's remarks did not constitute reversible error.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4412-16T2