**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5544-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANTHONY J. JAMES,

     Defendant-Appellant.

_____

Argued January 24, 2022 – Decided August 4, 2022

Before Judges Accurso, Rose and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 12-03-0210.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Michele C. Buckley, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Michele C. Buckley, on the brief).

PER CURIAM

Around 5:10 p.m. on September 28, 2011, defendant Anthony J. James called 9-1-1 from his Plainfield home, reporting he had just killed his girlfriend and was waiting on the porch for police to arrive so he could turn himself in. Audrey Tanksley's lifeless body lay in the fetal position in the bathtub. She had been stabbed ninety-four times.

The State contended defendant repeatedly stabbed Tanskley with three knives in "an act of rage." Rejecting his claims of diminished capacity and self-defense, the jury convicted defendant of all three counts charged in Union County Indictment No. 12-03-2101: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count three). After ordering appropriate mergers, the trial judge nonetheless imposed concurrent sentences on each count.[1] Defendant was sentenced to an aggregate sixty-year prison term, subject to the periods of parole ineligibility and supervision required by the No Early Release Act, N.J.S.A. 2C:43-7.2, on the murder conviction.

On appeal, defendant raises the following points for our consideration:

---

[1] In addition to the sixty-year prison term on count one, defendant was sentenced to a four-year prison term, with a two-year parole disqualifier on count two, and a sixteen-month prison term on count three.

A-5544-18

## POINT I

THE JUDGE IMPROPERLY INSTRUCTED THE JURY ON THE DUTY TO RETREAT; A PERSON ATTACKED INSIDE THAT PERSON'S OWN DWELLING HAS NO SUCH DUTY.
(Not raised below)

## POINT II

THE JUDGE'S DECISION TO SEPARATELY ASK THE JURY TO RETURN A YES/NO VERDICT ON THE ISSUE OF SELF-DEFENSE AS THE FIRST QUESTION ON THE VERDICT SHEET DEPRIVED DEFENDANT OF PROPER JURY DELIBERATION ON THE ISSUE OF SELF-DEFENSE IN TWO RESPECTS: (1) BECAUSE THE JURY INSTRUCTION NEVER TIED THE STATE'S BURDEN OF PROOF TO THE ANSWER TO THIS QUESTION; I.E., JURORS WERE NEVER TOLD TO ANSWER "YES" IF THEY MERELY HAD A REASONABLE DOUBT ON THE ISSUE OF SELF-DEFENSE; AND (2) BECAUSE SEPARATING THE SELF-DEFENSE DELIBERATIONS FROM THE OTHER DELIBERATIONS ON MURDER IMPROPERLY BIFURCATED THE JURY'S DELIBERATIONS ON THE MOST IMPORTANT ISSUE IN THE CASE: WHETHER HE SHOULD BE CONVICTED OF MURDER.
(Not raised below)

## POINT III

THE JUDGE IMPROPERLY OMITTED A "COURSE OF ABUSE" INSTRUCTION FROM THE JURY INSTRUCTION ON SELF-DEFENSE, STRANGELY LIMITING THAT CONCEPT ONLY TO

A-5544-18

PASSION/PROVOCATION MANSLAUGHTER. (Not raised below)

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE AND THE JUDGE IMPROPERLY IMPOSED SENTENCE ON COUNTS THAT HE HAD ORDERED MERGED.

We are persuaded by defendant's assertions in point I and conclude the flaws in the jury instruction on self-defense require reversal of defendant's convictions and remand for a new trial. We briefly address the contentions raised in points II and III for guidance in the event of a retrial. In view of our disposition, it is unnecessary to reach defendant's sentencing argument raised in point IV.

I.

Over the course of two trial days in January 2019, the State presented the testimony of twelve witnesses in its case-in-chief, including defendant's mother and sisters, the medical examiner, and an expert in DNA analysis. The State also introduced in evidence more than 150 exhibits, including photographs of defendant's appearance after his arrest. We summarize the evidence that is relevant to the issues raised on appeal.

4

Before calling the police, defendant called his mother at 4:00 p.m., stating: "Ma, I think, I think [sic] I killed Audrey." Defendant "was upset, crying, and it was hard to understand him." Defendant also called his pastor. Defendant's sisters accompanied their mother to defendant's home. The mother remained outside while the sisters went upstairs. One of the sisters described the appearance of the kitchen: "Broken glass. The table was knocked over. Blood was all over the place, on the floor, the walls, the sink, the cabinet." She also saw a bloody knife in the sink and blood "[o]n the floor, the walls, [and] the toilet" in the bathroom. Tanksley was lying on her back in the tub. She had stab wounds "over her whole body."

Police recovered three knives from defendant's kitchen sink – a large knife with an eight-inch blade and two knives with four-inch blades. The handle of each knife was broken. The State's DNA expert testified blood recovered from the tip of the blade on the larger knife and one of the smaller knives matched Tanksley's DNA profile. Although neither defendant nor Tanskley could be excluded as possible contributors of the mixture of blood found on the blade of the third knife, the blood on the handle matched Tanksley's DNA profile and defendant was excluded as the possible source of its DNA.

A-5544-18

During Tanskley's autopsy, the medical examiner observed at least ninety-four sharp force injuries and overlapping multiple blunt force injuries to Tanksley's head, neck, arms, hands, and torso. The doctor categorized the bruises on Tanksley's forearms and knees, as well as cuts on her forearms and hands, as defensive wounds. He opined the location of certain injuries was consistent with "straddl[ing] on someone's abdomen" while stabbing her. Tanksley's toxicology report revealed "evidence of recent use of alcohol."

Defendant testified and called three witnesses on his behalf, including his expert, Gary Robert Collins, M.D, who diagnosed defendant with "schizoaffective disorder of the bipolar type." Dr. Collins opined defendant experienced "fixed delusions," and suffered from diminished capacity when he killed Tanskley. The State's case on rebuttal attacked those conclusions. The State's competing expert, Louis B. Schlesigner, Ph.D., opined defendant "had a severe personality disorder with antisocial and borderline traits." He "f[ound no] evidence that would support the defense of diminished capacity."

By all accounts, the relationship between defendant and Tanskley was tumultuous. Defendant, who was an ordained pastor, dated Tanskley for about two to three years prior to her death. Because Tanskley struggled to find permanent housing, she and her son lived with defendant for most of the two

6

years prior to her death. The couple often argued. On several occasions, defendant told Tanskley and her son to leave, then invited them back when things cooled down.

Testifying on defendant's behalf, the couple's mutual friend, Yvonne Richardson-Cooper, described two instances during which she saw Tanskley assault defendant. On one occasion, Tanskley slapped defendant during a verbal dispute; on the other, Tanksley swung at defendant and punched him after accusing him of cheating on her. Defendant's former neighbor, Nedinia Biaggi Callejas, never saw Tanskley strike defendant, but nearly "every other day" she heard Tanskley "screaming" at defendant over another woman.

Defendant told the jury Tanskley was the aggressor and he acted in self-defense on the day of the incident. He returned home from looking for a new job and saw Tanksley in the kitchen with an open beer can on the table. Defendant asked whether she had been drinking. Tanksley "snapped" and called him "a lying bastard" about his interactions with another woman. Tanksley told defendant: "'I kill you [sic]. You don't know me. I don't give a fuck.'"

Tanksley then grabbed a knife from the kitchen counter and swung it at defendant, who "caught her by her arm." But "somehow," the couple wound up in the bathroom adjacent to the kitchen and "fell into the tub." Defendant could

7

not recall what happened next. He said Tanskley was "[n]othing but the devil." He claimed, "the Holy Spirit of God told [him] to call Pastor, [his] family and the police, and that's what [he] did." Repeating Tanskley "attacked [him]" and "wanted to kill [him]," defendant told the jury, she "put the fear of death in [him]."

On cross-examination, the prosecutor inquired about defendant's self-defense claim and his ability to leave his home during the incident:

> PROSECUTOR: [Y]ou could have just left on your own, correct?
>
> DEFENDANT: No, I couldn't get out that house. She jumped on me swinging. I wasn't making it through no front door. She right there in the kitchen swinging that knife at me. [sic]
>
> PROSECUTOR: You outweighed her by eighty-five pounds. You could have easily pushed her off you and walked out?
>
> DEFENDANT: No, it didn't happen like that. If it could have happened like that, it would have happened.
>
> PROSECUTOR: You ran away from her before, didn't you?
>
> DEFENDANT: 'Cause I was out in the street.
>
> PROSECUTOR: And you couldn't run away?
>
> DEFENDANT: It didn't happen like that.

PROSECUTOR: She's in the kitchen, correct, when you came home?

DEFENDANT: It didn't happen like that.

PROSECUTOR: You said she was in the kitchen, correct?

DEFENDANT: Yes, she was.

PROSECUTOR: And, therefore, when you walked into the kitchen, you are the one closest to the front door, correct?

DEFENDANT: No, no, you got to go through my bedroom to get to the living room and through the front door.

PROSECUTOR: But still you were a lot closer than she was?

DEFENDANT: No, I was not. I was right next to the bathroom, where the bathroom is next to the kitchen.

PROSECUTOR: And you're claiming today that this was self-defense on your part at that point, correct?

. . . .

DEFENDANT: No, I did not claim that at no 2011 [sic].

A-5544-18

PROSECUTOR: You're claiming it now, though. In 2016,[2] you were saying you had every right to defend yourself, right?

DEFENDANT: Five years later, looking at stuff through the law library, learning stuff through the law library, through the law. Inside my own home.

On redirect examination, defendant explained he had access to the jail's law library and his research revealed the law on self-defense states: "[A] man have a right to defend himself in his own dwelling if he feels threatened, if somebody going to do bodily harm to him [sic]. <u>Retreat is not necessary.</u>" (Emphasis added). Defendant stated: "I got the papers in my files and I looked it all up in the law library and asking God to help me to understand [sic]."

In summation, the prosecutor outlined the law on self-defense and argued:

Self-defense: This is not self-defense; not even close to self-defense.

Reasonably believes that the force is necessary to protect oneself: Well, ninety-four wounds is not [sic] reasonable.

Deadly force: You cannot respond with deadly force from a minor attack, <u>and you have to be able, if you could have retreated, to retreat</u>.

---

[2] Defendant testified at his July 2016 competency hearing. On December 20, 2016, the motion judge, who was not the trial judge, determined defendant was not competent to stand trial. Pursuant to defendant's ensuing application, on July 12, 2017, the motion judge found defendant competent to proceed to trial.

None of that happened here.

[(Emphasis added).]

Comparing photographs depicting "scratches" to defendant's chest and arm with the medical examiner's testimony about the severity of Tanskley's wounds, the prosecutor asked the jurors whether they "th[ought] she really came at him with a knife."

The trial judge instructed the jury on passion/provocation and self-defense, based primarily on the model jury charges. The parties agreed to the jury charges. As to self-defense, the judge included the following portion of the model jury charge:

> If you find that the defendant knew that he could avoid the necessity of using deadly force by retreating, provided that the defendant knew he could do so with complete safety, then the defense is not available to him.
>
> In your inquiry as to whether a defendant who resorted to deadly force knew that an opportunity to retreat with complete safety was available, the total circumstances, including the attendant excitement accompanying the situation, must be considered.
>
> The State has the burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue. This defense only applies if all the conditions or elements previously described exist. The defense must be rejected if the State disproves any of the conditions beyond a reasonable doubt.

11

The same theory applies to the issue of retreat. <u>The burden of proof is upon the State to prove beyond a reasonable doubt that the defendant knew he could have retreated with complete safety.</u> If the State carries its burden, then you must disallow the defense. If the State does not satisfy this burden and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must allow the claim of self-defense and acquit the defendant.

[(Emphasis added).]

## II.

Defendant's first three arguments on appeal belatedly challenge the trial judge's instructions and verdict sheet on defendant's self-defense claim. We therefore begin our review with well-settled principles applicable to all three points.

"Jury instructions demand careful attention." <u>State v. Montalvo</u>, 229 N.J. 300, 320 (2017). "The trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" <u>State v. Baum</u>, 224 N.J. 147, 159 (2016) (quoting <u>State v. Green</u>, 86 N.J. 281, 287-88 (1981)). "It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." <u>State v.</u>

12

Reddish, 181 N.J. 553, 613 (2004). Essentially, the judge's instructions on the law are a road map for the jurors to follow. State v. Fowler, 239 N.J. 171, 192 (2019). "[W]ithout an appropriate charge[,] a jury can take a wrong turn in its deliberations." State v. Martin, 119 N.J. 2, 15 (1990). Thus, "'[a]ppropriate and proper charges are essential for a fair trial.'" Baum, 224 N.J. at 158-59 (quoting Reddish, 181 N.J. at 613).

As a corollary to those principles, "clear verdict sheet directions" are also important. State v. Nelson, 173 N.J. 417, 449 (2002). A jury's "efforts to answer questions that they may have about verbal instructions almost certainly [will] involve an examination of the verdict sheet directions." Ibid. "If verbal instructions are unclear, or if jurors do not fully comprehend verbal instructions, the typewritten verdict sheet is likely the primary road map they will use to direct their deliberative path." Ibid.

Nonetheless, a jury verdict sheet "is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions." State v. Gandhi, 201 N.J. 161, 196 (2010). If an appellate court concludes "the oral instructions of a [trial] court were sufficient to convey an understanding of the elements to the jury, and where [the reviewing court] also find[s] that the verdict sheet was not misleading, any error in the verdict sheet can be regarded as

13

harmless." Id. at 197. This is so because "[t]he jury is presumed to have understood [the trial court's] instructions." State v. Vasquez, 265 N.J. Super. 528, 547 (App. Div. 1993).

A jury charge "must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005). The appropriate test to apply "'is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law.'" State v. McKinney, 223 N.J. 475, 496 (2015) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). "'Because proper jury instructions are essential to a fair trial, "erroneous instructions on material points are presumed to" possess the capacity to unfairly prejudice the defendant.'" Id. at 495 (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)).

When a defendant fails to object to an error regarding jury charges, we review for plain error. R. 1:7-2; see also State v. Funderburg, 225 N.J. 66, 79 (2016). "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." Id. at 79. We will only reverse if the error is "sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not

have reached.'" Ibid. (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)). However, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v. Afanador, 151 N.J. 41, 54, 56 (1997) (concluding the absence of the jury instruction at issue constituted plain error).

## A.

In point I, defendant asserts because the incident occurred in his home, the trial judge improperly instructed the jury he had a duty to retreat, if he could do so safely, before using deadly force. Acknowledging trial counsel primarily emphasized defendant's passion/provocation argument in summation, defendant nonetheless contends the improper instruction constituted plain error. The State acknowledges the instruction was erroneous, but urges us to affirm, "given the overwhelming evidence that defendant did not act in self-defense."

Prior to 1999, New Jersey courts held a resident of a dwelling had an obligation to retreat when attacked in the home by a cohabitant. See State v. Gartland, 149 N.J. 456, 467 (1997). The Legislature abolished that duty in 1999 when it eliminated language in Title 2C mandating a duty to retreat in one's own home, as long as the victim was not the initial aggressor. See L. 1999, c. 73, § 1.

The change in the law was largely prompted by concern for victims of domestic violence, who attempt to defend themselves from attacks within their own homes. See Gartland, 149 N.J. at 468-69 ("[The] loophole in the castle doctrine profoundly impacts battered women. If the attacker has as much right to be in the home where the attack occurs, the duty to retreat still applies." (alteration in original) (quoting Maryanne E. Kampmann, The Legal Victimization of Battered Women, 15 Women's Rights L. Rep. 101, 112-13 (1993))). The New Jersey amendment parallels a similar provision within the Model Penal Code that applies the "home-is-one's-castle" exception to the duty to retreat. See Model Penal Code § 3.04 (Am. Law. Inst. 2021).

Under current law, N.J.S.A. 2C:3-4(a) provides use of force is "justifiable for the protection of the person . . . when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." Pertinent to this appeal, the use of force is subject to certain limitations set forth in paragraph (b):

> (2) The use of deadly force is not justifiable under this section unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm; nor is it justifiable if:

(a)  The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or

(b)  The actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . , except that:

(i) <u>The actor is not obliged to retreat from his dwelling, unless he was the initial aggressor</u> . . . .

[(Emphasis added).]

To succeed on a self-defense claim where the defendant used deadly force, the jury must find:  (1) the defendant had an honest and reasonable belief that deadly force was necessary to protect himself from serious bodily injury or death, and (2) the defendant did not provoke the attacker.  N.J.S.A. 2C:3-4(a) and (b)(2)(a); <u>State v. Kelly</u>, 97 N.J. 178, 197 (1984); <u>State v. Gentry</u>, 439 N.J. Super. 57, 66-69 (App. Div. 2015).   Whether the defendant's belief was reasonable is measured by what the jury, not the defendant, considers reasonable under an objective standard.  <u>State v. Bess</u>, 53 N.J. 10, 16 (1968).  <u>Accord</u> <u>State v. Handy</u>, 215 N.J. 334, 356-57 (2013).

"The home is accorded special treatment within the justification of self-defense."  <u>Montalvo</u>, 229 N.J. at 319.  If the alleged assault occurred in the defendant's dwelling, the duty to retreat does not exist as long as the defendant did not provoke the attacker.  <u>Id.</u> at 320.  Conversely, if the alleged assault

17

occurred outside the defendant's dwelling, the jury must also find that the defendant was unable to retreat with complete safety.  N.J.S.A. 2C:3-4(b)(2)(b); see also State v. Rodriguez, 195 N.J. 165, 175 (2008).

The pertinent model jury charges make clear the "castle" doctrine must guide jurors in their deliberations over a defendant's assertion of self-defense when the defendant had been attacked in his or her own dwelling.  See Model Jury Charge (Criminal), "Justification - Self-Defense in Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011).  The model charge includes an important proviso in footnote four that cautions:  "An exception to the rule of retreat, however, is that a person need not retreat from his or her own dwelling, including the porch, unless he or she was the initial aggressor.  N.J.S.A. 2C:3-4[(b)](2)(b)(i)."  Model Jury Charge (Criminal), "Justification - Self-Defense in Self Protection (N.J.S.A. 2C:3-4)," at 3 n.4 (rev. June 13, 2011) (emphasis added).

In the present matter, the record does not reveal why the trial judge omitted this important principle and instead charged the jury defendant had an affirmative duty to retreat to safety from his own apartment.  There is no discussion of this portion of the instruction in the transcript of the charge

conference. As noted, defense counsel did not raise an objection to its inclusion in the charge.

While his appeal was pending, the Supreme Court decided State v. Hedgespeth, 249 N.J. 234 (2021), and defendant thereafter filed a letter, pursuant to Rule 2:6-11(d), arguing the case refutes the State's harmless error argument as to all three points on appeal. Defendant contends Hedgespeth "reaffirms the rule of State v. Scott, 229 N.J. 469, 485 (2017), that it is the jury's role, not this [c]ourt's, to determine the plausibility of a defendant's testimony." See Hedgespeth 249 N.J. at 252-53.

Although the trial courts' errors in Hedgespeth and Scott impacted either the defendant's ability to testify in his own defense, Hedgespeth, 249 N.J. at 252-53, or call a crucial witness, Scott, 229 N.J. at 484-85, the Court made clear the plausibility of a defense theory "is not reason to hold that the trial court's error was harmless." Hedgespeth, 249 N.J. at 253 (citing Scott, 229 N.J. at 484-85). "Determining implausibility 'is in the sole province of the jury. Judges should not intrude as the thirteenth juror.'" Hedgespeth, 249 N.J. at 253 (quoting Scott, 229 N.J. at 485).

Thus, while we acknowledge the sheer number of stab wounds inflicted on the victim is staggering, we express no opinion about the credibility of

defendant's self-defense claim. That is not our function. <u>See</u> <u>id.</u> at 253. We note, however, defendant's testimony placed his credibility squarely in issue. He told the jury his research demonstrated he had no duty to retreat because he was attacked in his own home. Referencing the layout of defendant's apartment, the prosecutor attempted to poke holes in that testimony, repeatedly asking why defendant could not leave. In summation, the prosecutor affirmatively told the jury defendant had a duty to retreat. The trial judge's instruction on self-defense endorsed that error, imposing a duty on defendant where none existed. The inaccurate instruction improperly impugned, albeit implicitly, defendant's credibility.

Viewing the evidence in the light most favorable to defendant, <u>Rodriguez</u>, 195 N.J. at 170, we conclude the error was "clearly capable of producing an unjust result," <u>R.</u> 2:10-2. Accordingly, we are compelled to vacate defendant's convictions on this basis and order a new trial.

B.

In point II, defendant argues he is independently entitled to a new trial because the first question posed on the verdict sheet asked the jury to answer "Yes" or "No" as to whether defendant acted in self-defense. If the jury answered "Yes," the verdict sheet instructed the jury to proceed to the questions

20

concerning the weapons offenses.  If the jury answered, "No," the jury would then consider whether defendant was guilty of murder or any lesser-included offenses.  Defendant claims the self-defense question violated his constitutional rights to a fair trial and due process in two ways:  (1) neither the jury instruction nor the verdict sheet indicated the jurors must determine the State disproved self-defense beyond a reasonable doubt; and (2) the jury's consideration of defendant's self-defense claim was "improperly bifurcate[d]" from its consideration of the substantive crimes that followed.  We are unpersuaded that a new trial is required on either basis.

Little need be said regarding defendant's first assertion.  As stated, the trial judge's self-defense charge largely tracked the model jury instruction.  Relevant here, the judge informed the jury:

> The State has the burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue.  This defense only applies if all the conditions or elements previously described exist.  The defense must be rejected if the State disproves any of the conditions beyond a reasonable doubt.

In view of the instruction given, the verdict sheet's omission of the State's burden of proof on self-defense was not misleading.  We presume the jury followed the trial judge's instructions.  Vasquez, 265 N.J. Super. at 547; see also State v. Vega-Larregui, 246 N.J. 94, 126 (2021).

21

Nor are we persuaded by defendant's second claim of error concerning the self-defense question. Defendant's reliance on State v. Simon, 79 N.J. 191 (1979), to support his bifurcation argument is misplaced.

In Simon, the trial court employed a "'bifurcate[d]' verdict procedure" wherein jurors were instructed to first answer "special interrogatories dealing with the issues raised by [a] statute of limitations" issue. Id. at 196 (first alteration in original). If the jury found an overt action occurred within the period of limitations, then the judge "would submit the case to the jury for deliberations upon a general verdict." Ibid. The Supreme Court concluded the use of special interrogatories before the jury commenced its final deliberations was plain error, warranting reversal of the defendants' convictions and remand for a new trial. Id. at 198. Here, the jury was not required to answer special interrogatories before deliberating; the "yes-or-no" question regarding self-defense was part of the verdict sheet.

As the judge explained when reviewing the form with the jury:

> If your answer is "yes," you have found the defendant not guilty of killing Audrey Tanksley due to self-defense. If that is the case, you're going to go to the weapons questions which begin at Question No. 5, Possession of a Weapon For an Unlawful Purpose and Unlawful Possession of a Weapon and you'll address those questions.

22

If your answer is "no" to the question of did the Defendant act in self-defense, you will then go on to consider the charges relating to Murder, potentially, Aggravated Manslaughter, potentially, Reckless Manslaughter.

Because a valid claim of self-defense "would entitle [the defendant] to an exoneration of criminal liability on the murder, aggravated manslaughter, and manslaughter charges," Rodriguez, 195 N.J. at 171, any error in the inclusion of the yes-or-no question as the first question on the verdict sheet was harmless. Should the matter be retried on remand, the trial judge shall review with the parties whether the yes-or-no question should be included on the verdict sheet and, if so, whether the question should be reworded to include the prosecutor's burden of proof.

## C.

Lastly, we address defendant's "course of abuse" argument, raised in point III. Defendant contends, based on the evidence adduced at trial that Tanskley had "violently assaulted defendant on more than one occasion," the self-defense charge improperly omitted the following instruction: "A continued course of ill treatment by the decedent against the defendant can constitute adequate provocation to kill." Defendant claims the inclusion of this instruction in the passion/provocation charge – and its omission from the self-defense charge –

23

highlighted the error. Again, defendant claims the omission independently warrants reversal of his convictions and remand for a new trial.

When discussing how the jury should consider the testimony of defense witnesses Biaggi Callejas and Richardson-Cooper, the judge twice instructed the jurors they could consider Tanksley's prior acts of violence against defendant. Prior to their testimony, the judge issued the following limiting instruction, in pertinent part: "The testimony is being offered for the purpose of aiding your determination of: (1) the reasonableness of [defendant]'s use of force against Ms. Tanksley on September 28th, 2011; and (2) whether there was adequate provocation for [defendant]'s use of force on September 28th, 2011." In his final jury instructions, prior to explaining the substantive charges, the judge told the jurors the "testimony [of those witnesses wa]s being offered for the sole purpose of aiding [their] determination of the issues of self-defense and passion/provocation."

While it would have been preferable for the trial judge to have included the course of conduct instruction in the self-defense charge, we are unable to conclude under the plain error standard that the failure to do so constitutes reversible error. Assuming on remand defendant interposes the same defense

24

through these or any other witnesses, the self-defense charge should include the course of abuse instruction.

Reversed and remanded for a new trial, with a proper instruction on self-defense in accordance with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5544-18